[S.F. No. 22888. In Bank. May 4, 1972.]

JEFFREY A. YOUNG et al., Petitioners, v.
GEORGE H. GNOSS, as County Clerk, etc., et al., Respondents.

## COUNSEL

J. Anthony Kline, Robert L. Gnaizda, William A. Dobrovir and Sarel M. Kandell for Petitioners.

Douglas J. Maloney, County Counsel, George J. Silvestri, Jr., Deputy County Counsel, and William H. Stoffers, County Counsel, for Respondents.

John D. Maharg, County Counsel (Los Angeles), Edward H. Gaylord, Assistant County Counsel, Joe Ben Hudgens, Deputy County Counsel, Robert G. Berrey, County Counsel (San Diego), and Joseph Kase, Jr., Assistant County Counsel, as Amici Curiae on behalf of Respondents.

## OPINION

**MOSK, J.**—This proceeding for writ of mandate challenges the constitutionality of the provisions of California law which impose durational residence requirements of 90 days in the county and 54 days in the precinct as a prerequisite to voting in this state,[1] and which close the voter registration books 54 days before an election.[2] As will appear, we have concluded that the cited provisions violate the equal protection clause of the Fourteenth Amendment as applied in *Dunn v. Blumstein* (1972) 405 U.S. 330

---

[1]Article II, section 1, of the California Constitution declares that the right of suffrage may be exercised by every citizen who, inter alia, on the date of the election shall have been a resident "of the county in which he or she claims his or her vote 90 days, and in the election precinct 54 days. . . ."

[2]Elections Code section 203 provides in relevant part that "Registration of electors shall be in progress at all times except during the 53 days immediately preceding any election, when registration shall cease for that election as to electors residing in the territory within which the election is to be held." Unless otherwise indicated, all statutory references in this opinion are to the Elections Code.

[31 L.Ed.2d 274, 92 S.Ct. 995], but that petitioners are not entitled to relief at this time.

Petitioner Young established his present residence in Marin County, California, on March 10, 1972. Prior to that date he was a resident of Iowa. He applied to register to vote in Marin County in the primary election to be held on June 6, 1972. He was refused registration by respondent Gnoss, the Marin County Clerk, on the sole ground that he could not comply with the 90-day residence requirement.[3]

At the time of filing the petition, petitioner Isaac was a resident of Texas intending to establish a new permanent residence in Monterey County, California, no later than May 1, 1972. Through her counsel petitioner inquired of respondent Maggini, the Monterey County Clerk, whether she would be permitted at that time to register to vote in Monterey County in the June primary election. Respondent replied in the negative, basing his refusal on the fact that petitioner would then be unable to comply with the 54-day residence requirement and the corresponding period for closing of registration.[4]

The remaining petitioners are three nonprofit organizations which assert that the right to vote and the right to travel of numerous individuals among their membership is or will be denied or abridged by reason of the enforcement or threat of enforcement of the provisions of law here challenged.[5]

Petitioners invoke the original jurisdiction of this court, and seek relief by writ of mandate. For the reasons stated in *Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 570, footnotes 1 and 2 [96 Cal.Rptr. 697, 488 P.2d 1], the case falls within the limited category in which we deem it proper to exercise original jurisdiction, and the prayer is for the appropriate remedy. (Accord, *Wenke* v. *Hitchcock* (1972) 6 Cal.3d 746, 750-751 [100 Cal.Rptr. 290, 493 P.2d 1154].)

The restrictions placed on the right of suffrage by article II, section 1,

---

[3]The 90-day period began in this case on March 8, 1972.

[4]The 54-day period began on April 14, 1972. The petition was not premature as to Isaac: although as a general rule mandate will not lie in the absence of a present duty to act, the remedy may be sought when it is clear from the circumstances that the public officer does not intend to comply with his obligation when the time for performance arrives. (*Imperial Mut. L. Ins. Co.* v. *Caminetti* (1943) 59 Cal.App.2d 494, 497-498 [139 P.2d 693].)

[5]Although not named as such in the petition, we deem the California Secretary of State to be a proper party respondent to this proceeding, and shall treat him accordingly. The Secretary of State has stipulated that he may be joined as such a party, and has waived service of process.

of the California Constitution have more than once failed to survive judicial scrutiny. In *Otsuka* v. *Hite* (1966) 64 Cal.2d 596 [51 Cal.Rptr. 284, 414 P.2d 412], we held that the section's disenfranchisement of all persons convicted of "infamous crimes" can constitutionally be applied only to those guilty of offenses which actually evidence corruption or dishonesty. In *Castro* v. *State of California* (1970) 2 Cal.3d 223 [85 Cal.Rptr. 20, 466 P.2d 244], we held that the section's exclusion from voting of all persons unable to "read the Constitution in the English language" cannot constitutionally be invoked against those who are fully literate in another tongue and have access to substantial sources of political information in that language. And in *Keane* v. *Mihaly* (1970) 11 Cal.App.3d 1037 [90 Cal.Rptr. 263], the Court of Appeal struck down on equal protection grounds the section's limitation of the franchise to persons who have resided in this state for one year prior to election day. We approve of *Keane*, and now turn to the question whether the remaining durational residence requirements of article II, section 1, can withstand constitutional analysis.

The United States Supreme Court recently addressed itself to this issue in *Dunn* v. *Blumstein* (1972) *supra*, 405 U.S. 330. There a new resident of Tennessee challenged the jurisdiction's requirements that a voter be a resident of the state for one year and the county for 90 days in order to exercise the suffrage. The court first observed that durational residence requirements both affect the fundamental right to vote by completely excluding certain citizens from the franchise, and create a suspect classification of those citizens who lose that right merely because they have recently exercised their additional right to travel within the United States. (92 S.Ct. at pp. 999-1003.) For these reasons, the court ruled, durational residence requirements must be judged by the "strict" equal protection test, i.e., by the now-settled principle (see cases collected in *Castro* v. *State of California, supra,* 2 Cal.3d at pp. 234-236) that a state law which operates to deny the franchise to a portion of its citizens violates the equal protection clause unless the state can demonstrate that it promotes a compelling government interest and is necessary in the sense that it is the least burdensome means available to achieve that goal. (92 S.Ct. at p. 1003.)

The high court then reviewed two interests claimed to justify durational residence requirements—the prevention of electoral fraud and the informed use of the ballot by voters knowledgeable about the issues. The court agreed that preventing electoral fraud is a compelling governmental interest (see also *Otsuka* v. *Hite* (1966) *supra*, 64 Cal.2d 596, 603 [51 Cal.Rptr. 284, 414 P.2d 412]), but held that a durational residence requirement is not a necessary means of achieving it. That purpose is adequately served,

the court explained, by the oath requirement of the state's voter registration system, coupled with the threat of prosecution for violation of penal statutes prohibiting voter fraud. (*Id.* at pp. 1004-1009.)

Secondly, the court acknowledged it may well be true that new residents as a group know less about state and local issues than old residents, but held that a durational residence requirement is much too crude a tool for insuring that knowledge among all voters: "The classifications created by durational residence requirements obviously permit any long-time resident to vote regardless of his knowledge of the issues—and obviously many long-time residents do not have any. On the other hand, the classifications bar from the franchise many other, admittedly new, residents who have become minimally, and often fully, informed about the issues. Indeed, recent migrants who take the time to register and vote shortly after moving are likely to be those citizens . . . who make it a point to be informed and knowledgeable about the issues. Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election, the State cannot seriously maintain that it is 'necessary' to reside for a year in the State and three months in the county in order to be minimally knowledgeable about congressional, state or even purely local elections." (Fn. omitted.) (*Id.* at p. 1011.)

Accordingly, the high court affirmed a ruling of a three-judge federal panel holding unconstitutional the one-year and 90-day residence requirements challenged in *Dunn*.

We are bound, of course, by this decision of the United States Supreme Court. ■ The 90-day residence requirement of article II, section 1, of our Constitution is indistinguishable in purpose and effect from the 90-day period invalidated in *Dunn;* for the reasons there stated, that requirement is unconstitutional.[6]

A more difficult question is presented by the 54-day residence requirement and parallel closing date of the registration books. It is true that the Supreme Court has in fact not yet adjudicated the constitutionality of any period shorter than 90 days.[7] But it is well to remember that in *Dunn* the court declared that the "strict" equal protection test must be applied not

---

[6]On April 6, 1972, the Secretary of State drew the same conclusion and so advised all county clerks and registrars of voters in California.

[7]On April 3, 1972, the Supreme Court took summary action in 11 cases presenting issues similar to *Dunn*, affirming 7 and vacating 4 for further consideration in the light of that decision. (40 U.S.L.Week 3479, 3483.) None of the cases involved a durational residence requirement of less than 90 days, however.

just to the one-year and 90-day periods there in issue, but to all such durational restrictions on the right of suffrage. (92 S.Ct. at p. 1003.) Respondents' burden, accordingly, is to show that the 54-day period prescribed by California law is necessary to promote a compelling governmental interest.

No claim is made that the 54-day period serves the purpose of preventing fraud by permitting election officials to go behind the prospective voter's oath and determine the bona fides of his asserted residence.[8] Nor is it contended the 54-day period is required to insure that the prospective voter will have resided in the community long enough to have become acquainted with local issues (cf. *Bourland* v. *Hildreth* (1864) 26 Cal. 161, 179). In fact, respondents and amici curiae are not essentially concerned with the 54-day *residence* requirement of article II, section 1, of the Constitution, but with the code provision (§ 203) closing *registration* 54 days before an election. Were it not for that period, they argue, it would be physically impossible for them to discharge certain pre-election duties imposed by other sections of the code. Stating the point conversely, the Secretary of State asserts that "The 54-day registration cut-off does not appear to be an administrative necessity in California, so long as local officials are relieved of certain mechanical requirements with respect to those voters who register after the 54th day prior to an election."[9] We therefore inquire into the substance of those "mechanical requirements."

The first group of statutes relied on by respondents directs the county clerk to furnish lists of registered voters and affidavit information to the Secretary of State and to political parties within a specified number of days before the election.[10] In *Silver* v. *Brown* (1965) 63 Cal.2d 270, 277 [46

---

[8]In any event, the *Dunn* opinion convincingly demonstrates that durational residence requirements would provide no real protection against such fraud. (92 S.Ct. at p. 1005.)

[9]The same view is expressed in a declaration filed by William N. Durley, Sacramento County Clerk, who also identifies himself as a director of the County Clerks' Association of California and cochairman of the Elections Legislative Committee of that association.

[10]Section 6460 provides that 35 days before the election a statement of the number of voters in each county, together with their party affiliations, shall be transmitted to the Secretary of the State. The Secretary of State shall compile these statements into a statewide list available to any elector upon request.

Sections 456.5 and 456.6 provide that 30 days before the election a copy of the index of registered voters or the data-processing tape file containing that information shall be transmitted to the Secretary of State. The Secretary of State may make that information available to any person for election or governmental purposes.

Section 459 provides that 30 days before the election a copy of the tabulating cards or data-processing tape containing the information set forth in the affidavits

Cal.Rptr. 308, 405 P.2d 132], we explained that "No reason appears, however, why inability to comply with section 6460 would interfere with the orderly conduct of the primary and general elections. Its purpose is merely to provide general electoral information." The same is obviously true of sections 456.5 and 456.6. The fact that such information is made available to "any person" suggests, of course, that an additional purpose is to facilitate its use by candidates or political parties. The latter purpose is clearly evident in sections 455 and 459, which in effect furnish political parties with current names and addresses of all registered voters in each constituency. This information permits the parties to canvass the voters by mail or personal contact in order to influence their choices in the forthcoming election. We easily perceive the interest of the political parties in obtaining such information. But we cannot hold that interest so essential to the conduct of the election that it justifies cutting short the registration process and thereby depriving would-be voters of their right of suffrage. It is not, in short, a compelling governmental interest within the meaning of *Dunn.*

Respondents next point to section 10009, which directs the county clerk to prepare sample ballots listing the names of the candidates for the various offices at least 25 days before the election, and to mail such ballots to the registered voters not more than 40 nor less than 5 days before the election. Also included in the latter mailing, we add, are the "voter's pamphlet" containing the statements of personal qualifications furnished by the candidates (§ 10012.5) and the "ballot pamphlet" containing the text of any measures submitted directly to the voters by the Legislature or by initiative or referendum, their analysis by public counsel, and any written arguments for or against such measures (§§ 3558-3574).

The purpose of these statutes—to promote a more informed electorate—is doubtless commendable. But voter education is by no means the responsibility of the state alone. In *Castro* v. *State of California* (1970) *supra,* 2 Cal.3d 223, 242, we specifically rejected the proposition that "the state must not only provide all qualified citizens with an equivalent opportunity to exercise their right to vote, but must also provide perfect conditions under which such right is exercised. The equal protection clause does not require, for example, that California provide explanatory material (see Elec. Code, § 3566) of varying degrees of complexity and sophistication

---

of voter registration shall upon demand be furnished to the county central committee of any political party participating in the election.

Section 455 provides that 25 days before the election copies of the index of registered voters shall be furnished upon demand to the state or county central committees of such political parties. (See also § 454.)

even though the ability to comprehend an analysis of a technical ballot measure may vary widely among voters."[11] In view of the broad exposure of the voting public to both information and persuasion bearing on the candidates and the issues via the newspapers, radio and television, particularly during the final month of each political campaign, we cannot hold that the mailing of the above-described materials is a compelling governmental interest within the meaning of *Dunn*.[12]

Thirdly, respondents stress that under section 14002, subdivisions (a) and (b), the county clerks are required to provide local election officials with the original affidavits of registration and printed copies of the indexes of registered voters in each precinct. Such documents are needed, of course, to identify each prospective voter as he presents himself at the polls. Their timely delivery to the precinct officials is therefore essential to the conduct of the election, and constitutes a compelling governmental interest. But the question remains whether the closing of registration 54 days before the election is necessary to achieve that goal.

No such showing is here made. We observe, rather, that in distinction to the other statutes discussed above, section 14002 prescribes no minimum pre-election period within which it must be obeyed. Greater flexibility, therefore, may be permitted in complying with its terms. For example, if an influx of registrations after the 54th day prior to the election were to render impractical the schedule heretofore followed, nothing in the statute would prevent the county clerks from delivering the affidavit books and voter indexes in two cycles—i.e., the first covering the voters whose affidavits were on file 54 days before the election, and the second for those whose affidavits were received during the remaining registration period. We recognize that the volume of registrations usually increases as the end of that period approaches, but the evidence before us indicates that the second group of voters would nevertheless remain a relatively small percentage of the first.[13] Accordingly, to cut off all registration 54 days before

[11]Indeed, there may be constitutional limits to the degree to which a state may concern itself with how "knowledgeable" its prospective voters are. The Supreme Court declined to decide that issue in *Dunn*, but did point out that by prohibiting voting tests in the 1970 Voting Rights Act "Congress declared federal policy that people should be allowed to vote even if they were not well informed about the issues." (92 S.Ct. at p. 1010, fn. 29.)

[12]We note petitioners' assertion that few other states similarly furnish elaborate ballot materials to their electorate or current lists of voter registration to their political parties (see fn. 10, *ante*).

[13]For example, Professor Edmond Costantini, Chairman of the Department of Political Science at the University of California at Davis and specialist in the field of voting patterns and the effect on registration of durational residence requirements, states by affidavit that if registration were to remain open an additional 24 days

the election in order to facilitate compliance with section 14002 is *not* the method which is the least burdensome on the exercise of the right of suffrage within the meaning of *Dunn*.

■ We conclude that both the 54-day residence requirement of article II, section 1, of the Constitution and the parallel closing date for voter registration prescribed by Elections Code section 203 violate the equal protection clause of the Fourteenth Amendment.

We turn to the question of remedy. The parties have submitted a number of plans to this court. They suggest a variety of alternative closing dates for voter registration, and propose elaborate provisions for solving the different administrative problems assertedly caused by each of those dates. But to adopt any of the proposed solutions—or to devise still another response to the administrative difficulties in question—is a matter for the legislative branch of the government. Our function at this time is simply to declare the minimum that must be done to implement *Dunn* v. *Blumstein*.

In *Dunn* the Supreme Court, having struck down Tennessee's durational residence requirements of one year and 90 days, concluded that a period of 30 days should be ample to permit the state to complete its administrative tasks prior to elections. (92 S.Ct. at p. 1006.) We concur in that figure.[14] ■ By parity of reasoning, we hold that in California no durational residence requirement in excess of 30 days may constitutionally be imposed, and general voter registration must remain open at all times except during

---

(i.e., until 30 days before the election), the number of registered voters in California would increase by 2½ percent.

[14]There is additional persuasive authority for the figure of 30 days. As the Supreme Court emphasized in *Dunn*, "In § 202 of the 1970 Federal Voting Rights Act, Congress outlawed state durational residence requirements for presidential and vice presidential elections, and prohibited the States from closing registration more than 30 days before such elections. 42 U.S.C. § 1973aa-1. In doing so, it made a specific finding that durational residence requirements and more restrictive registration practices do 'not bear a reasonable relationship to any compelling State interest in the conduct of presidential elections.' 42 U.S.C. § 1973aa-1(a)(6). We upheld this portion of the Federal Voting Rights Act in *Oregon* v. *Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1971)." (92 S.Ct. at p. 1004; see also *id.* at p. 1006, fn. 19.) We note that the precise language of the federal statute (42 U.S.C. § 1973aa-1, subd. (d)) prohibits the states from closing registration "later than thirty days" before election, thereby requiring that registration remain open to and including the 30th day. Some years earlier a presidential commission recommended that in order to minimize the disenfranchising effect of restrictive registration procedures, voter registration should continue as long as possible and should not end more than "three or four weeks" before election day. (Report of President's Commission on Registration and Voting Participation (1963), p. 12.) Finally, petitioners cite statistical authority for the proposition that in 1968 the average closing date of voter registration across the country was 28 days prior to election.

the 29 days immediately preceding an election.[15] ■ Furthermore, .the ancillary statutes imposing pre-election duties on county clerks which we here hold are not compelling governmental interests within the meaning of *Dunn*[16] must give way before these constitutional imperatives: to the extent that such statutes cannot as a practical matter be fully complied with within the 30-day period prior to election, the county clerks are relieved of the duties in question. Nevertheless, the county clerks should make every reasonable effort to comply with the spirit if not the letter of these statutes, e.g., by mailing registration lists to the political parties and informational materials to the voters in two cycles, as we suggested above in discussing the delivery of affidavit books and voter indexes to local election officials. ■ We recognize that such a two-step process may increase in some respects the cost of conducting elections, but we reiterate that "Avoidance or recoupment of administrative costs, while a valid state concern cannot justify imposition of an otherwise improper classification, especially when, as here, it touches on 'matters close to the core of our constitutional system.' " (*Castro* v. *State of California* (1970) *supra,* 2 Cal.3d 223, 242, and cases cited.)

■ Finally, we have determined that the changes in election procedures which we now announce need not be put into effect for the June 1972 primary, but must be enforced at the November 1972 general election. ■ "[A] determination that an existing plan of governmental operation denies equal protection does not necessarily require invalidation of past acts undertaken pursuant to that plan or an immediate implementation of a constitutionally valid substitute." (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 619 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) ■ Too little time remains before the June primary to permit the county clerks to implement these changes in orderly fashion, and an order compelling hasty action could well result in needless confusion. Deferring the changes until the November election, moreover, will give the Legislature the opportunity to address itself to the problem and to adopt whatever measures may be deemed necessary or appropriate to give effect to *Dunn* v. *Blumstein* and the decision herein.

It follows that petitioners are not entitled to the relief prayed for with

---

[15]By "general registration must remain open" we mean that the registration procedures heretofore in use during the period immediately prior to the 54th day before the election must be extended, without change, through the 30th day.

[16]I.e., Elections Code sections 455, 456.5, 456.6, 459, 3573, 6460, 10009, and 10012.5. The analysis also applies to statutes imposing similar duties with respect to elections other than primaries (e.g., § 10012).

respect to the June 1972 primary. Since there is no reason to believe that any of the parties to this proceeding will not accede to our holdings herein, no purpose would be served by issuing a writ of mandate to compel such compliance with respect to the November 1972 general election. (See *Legislature* v. *Reinecke* (1972) 6 Cal.3d 595, 604 [99 Cal.Rptr. 481, 492 P.2d 385].) For this reason, the petition for peremptory writ is denied. Petitioners shall not recover their attorneys' fees, but all parties shall recover their costs from the State of California. (See Code Civ. Proc., § 1095.)

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.