[No. B009565. Second Dist., Div. Six. Dec. 20, 1985.]

DAVID HENRY COLLIER et al., Plaintiffs and Appellants, v.
HOWARD C. MENZEL, as County Clerk-Recorder, etc.,
Defendant and Respondent;
COUNTY OF SANTA BARBARA,
Real Party in Interest and Respondent.

COUNSEL

Willard Hastings, Jr., for Plaintiffs and Appellants.

Kirk Ah Tye as Amicus Curiae on behalf of Plaintiffs and Appellants.

Kenneth L. Nelson, County Counsel, and Don H. Vickers, Deputy County Counsel, for Defendant and Respondent.

No appearance for Real Party in Interest and Respondent.

OPINION

STONE, P. J.—Appellants filed a petition for writ of mandate in superior court seeking to compel respondent, the Santa Barbara County Clerk-Recorder, to allow appellants to register to vote. They appeal the trial court's denial of their petition.[1]

Appellants, three persons identifying themselves as "homeless" citizens and indigents of Santa Barbara County, submitted affidavits of registration to vote to respondent in September 1984. The address appellants listed as their residence on their affidavits was "100 Montecito Street." A park owned by the City of Santa Barbara and commonly known as Fig Tree Park is located at this address, a gathering place for homeless persons. Camping or sleeping overnight on park grounds is prohibited by city ordinance.

---

[1]This court granted permission to the Santa Barbara Homeless Coalition (Coalition) to file an amicus curiae brief in support of appellants.

After receiving their registration affidavits, respondent sent appellants a letter informing them that the address listed on their registration applications was insufficient as a residence address and therefore prevented respondent from determining appellants' correct voting precinct. The letter enclosed blank registration forms so that appellants could clarify their addresses. It also informed appellants that they were legally entitled to vote in the precincts of their former residences until they established new residences.

Appellants contend that their registration applications complied with statutory requirements for voter registration. They further claim that respondent's failure to process these applications violated their right to the equal protection of the laws under the United States Constitution.

We conclude the affidavits were sufficient for voter registration purposes and reverse the judgment below. We also conclude that, as a consequence of the denial of these affidavits, appellants were unjustifiably deprived of their right to vote on an equal basis with other citizens.

## I. *State Registration Requirements*

Appellants argue that respondent abused its administrative discretion by failing to accept their registration affidavits because California law does not require that a voter registrant live in an actual building. Appellants assert they have complied with state voter registration laws since they are citizens of California, they live in Santa Barbara, and have the intent to remain there permanently. Respondent counters that its rejection of appellants' registration affidavits was proper as appellants listed for their addresses a place where there are no living facilities. Thus, respondent contends, appellants have not established an essential factor which would demonstrate a domicile in Santa Barbara.

■ A review of state election laws supports appellants' position. The California Constitution provides that a "United States citizen 18 years of age and a resident in the state may vote." (Cal. Const., art. II, § 2.) ■ Even if a person may be qualified to vote under constitutional standards, he/she may not be entitled to vote if compliance with state registration laws has not been met. (Elec. Code, § 100.) Proper registration is a condition precedent to the exercise of the right to vote. (*Kagan* v. *Kearney* (1978) 85 Cal.App.3d 1010, 1015 [149 Cal.Rptr. 867].)

In order to be properly registered, an elector must be a resident of an election precinct. (Elec. Code, § 17; *Schaff* v. *Beattie* (1968) 265 Cal.App.2d 904, 910 [72 Cal.Rptr. 79].) Since Fig Tree Park, the alleged

residence of appellants, lies within Santa Barbara City, a county election precinct is determinable on the basis of appellants' registration affidavits.

■ The next issue for consideration is whether appellants are residents of the park. Election Code, section 200, subdivision (a), defines a person's "residence" as his/her "domicile." "The domicile of a person is that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning. . . ." (Elec. Code, § 200, subd. (b).)

For voting purposes then, the Legislature has set up the following residential requirements: (1) a fixed habitation, and (2) an intention of remaining at that place and of returning to it after temporary absences. Appellants have satisfied both statutory requirements of fixed habitation and intent to remain.

■ "Habitation" is defined by Webster's New Collegiate Dictionary (9th ed. 1983) at page 545, as "a dwelling place;" "dwelling" is defined as "a shelter (as a house or building) in which people live." (p. 390.) We do not find that this reference to a house or building is all-inclusive or eliminates other types of abodes. A dwelling or shelter is a subjective term since it can mean entirely different things to different people.

More important, the Legislature has not adopted the traditional notion that a dwelling or habitation for voter registration signifies four walls. Section 207 of the Election Code provides: "Residence in a trailer or vehicle or at any public camp or camping ground may constitute a domicile for voting purposes if the registrant complies with other requirements of this article." Implicit in this language is that a public camping ground itself without residence in a vehicle or trailer is deemed a fixed habitation. We find that the designation of a public park as a residence for voting purposes likewise can qualify as a place of fixed habitation. While a park may not be legally designated as a place for camping, it is a physical area where a person can sleep and otherwise use as a dwelling place. ■ Furthermore, we acknowledge the Coalition's observation that a versatile concept of residency harmonizes with the "fundamental statutory policy" in California of effectuating and maintaining at the highest possible levels voter registration and voting. (Elec. Code, §§ 302, 304.)

■ Have appellants satisfied the second requirement of a present intent to remain in the park? Appellants' submission of their signed registration affidavits was sufficient compliance with this requirement. Under California law, a person who signs an affidavit of registration has certified that the contents of the affidavit are true and correct. No other written proof of

residency is required. (Elec. Code, §§ 301, 500, subd. (j).) We also note that although the city park has no postal address, appellants supplied respondent with a post office box number. They thus fulfilled the additional requirement that a mailing address be provided on the affidavit if it is different from the residential address. (Elec. Code, § 500, subd. (d).)

■ It is important to point out that, pursuant to city ordinance, the city park appellants designate as their residence is legally forbidden for use as a residence. Since appellants have "no right" to use the park for a habitation, do they have the required intent to remain there? Yes. Appellants' intent to remain in the park is legally independent of any intent to violate the ordinance. We do not hold that respondent cannot enforce its ordinance making it illegal to live in a public park. We do hold that so long as petitioners actually reside there, they may register to vote in that precinct.

## II. *Equal Protection*

Appellants contend that respondent's refusal to register them to vote discriminates against them as a class of homeless or indigent persons. Appellants do not challenge the constitutionality of the statutory requirement that voter registrants must be residents of an election precinct. Their assertion is that respondent has unconstitutionally interpreted and applied this requirement since appellants have demonstrated they are residents of an election precinct in the City of Santa Barbara.

■ To decide whether a law or governmental action violates the guarantee of equal protection, it is necessary to determine: (1) the standard of review based on the individual interest involved or the particular classification, and (2) the governmental interest asserted in support of the classification. (*Dunn* v. *Blumstein* (1972) 405 U.S. 330, 335 [31 L.Ed.2d 274, 280, 92 S.Ct. 995].) Here, appellants' interest in voting is at stake.

■ The right to vote on an equal basis with other citizens is a fundamental right in our democratic society and one of the basic civil rights of man which preserves all other rights. (*Reynolds* v. *Sims* (1964) 377 U.S. 533, 561-562 [12 L.Ed.2d 506, 527, 84 S.Ct. 1362]; *Pitts* v. *Black* (D.C.N.Y. 1984) 608 F.Supp. 696, 708.) Classifications denying this right deserve the strictest scrutiny. (*Dunn* v. *Blumstein, supra,* pp. 335-336 [31 L.Ed.2d at p. 280].) Under this stringent standard, the government must not only demonstrate that it has a compelling public interest in utilizing the classification, it must also show that the classification is necessary to serve its objectives. (*Id.,* p. 343 [31 L.Ed.2d at p. 285].)

■ Respondent contends it is not necessary to find a compelling public interest in order to sustain the validity of statutory residence requirements

for voting. Respondent is partially correct. States and their political subdivisions have the unquestioned constitutional authority to restrict availability of the ballot to those persons who reside within their borders. (*Carrington* v. *Rash* (1965) 380 U.S. 89, 91 [13 L.Ed.2d 675, 677, 85 S.Ct. 775]; *Holt Civic Club* v. *Tuscaloosa* (1978) 439 U.S. 60, 68-69 [58 L.Ed.2d 292, 301, 99 S.Ct. 383].) Thus, registration statutes are usually sustained on the theory that they do not impair or abridge an elector's right to vote, but merely regulate its exercise. "[R]egistration is not a qualification of an elector and cannot add to the qualifications fixed by the constitution; but is to be regarded as a reasonable regulation by the legislature for the purpose of ascertaining who are qualified electors in order to prevent illegal voting." (*Minges* v. *Board of Trustees* (1915) 27 Cal.App. 15, 17-18 [148 P. 816].)

■ Although registration laws are valid if reasonable, these laws and the interpretation of them will receive strict scrutiny if they *deny* certain classes of *residents* the right to vote. (*Kollar* v. *City of Tucson* (D.C. Ariz. 1970) 319 F.Supp. 482, 485, affd. (1970) 402 U.S. 967 [29 L.Ed.2d 133, 91 S.Ct. 1665].) Thus, a governmental entity is not justified in excluding *otherwise qualified voters* who have no way of making themselves eligible to vote. (*Rosario* v. *Rockefeller* (1973) 410 U.S. 752, 757 [36 L.Ed.2d 1, 6, 93 S.Ct. 1245]; *Holt Civic Club* v. *Tuscaloosa, supra,* 439 U.S. 68.)[2]

■ We have concluded that appellants' affidavits showed appellants are residents of Santa Barbara. We also find that respondent's rejection of appellants' registration affidavits absolutely denied them the right to vote. Hence, respondent's interpretation and application of state registration laws deserve strict scrutiny.

■ Respondent argues that appellants were not completely denied the right to vote because they have the ability under registration laws to vote in the precinct of their last established domicile. (Elec. Code, §§ 202, subd. (a); 207; 208.) We disagree. Requiring appellants to travel to their former

---

[2]For example, long-term durational residence requirements have been found to arbitrarily and completely exclude new residents from their exercise of the franchise. (*Dunn* v. *Blumstein, supra,* 405 U.S. 330; *Keane* v. *Mihaly* (1970) 11 Cal.App.3d 1037 [90 Cal.Rptr. 263]; *Young* v. *Gnoss* (1972) 7 Cal.3d 18 [101 Cal.Rptr. 533, 496 P.2d 445], cert. den. *Gnoss* v. *Young* (1972) 409 U.S. 915 [34 L.Ed.2d 176, 93 S.Ct. 236].) Equal protection violations have also been found to occur where voter registration was denied to unmarried minors residing away from their parents' home (*Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565 [96 Cal.Rptr. 697, 488 P.2d 1]); to residents of federal enclaves (*Carrington* v. *Rash, supra,* 380 U.S. 89; *Evans* v. *Cornman* (1970) 398 U.S. 419 [26 L.Ed.2d 370, 90 S.Ct. 1752]); to residents who were not real property taxpayers (*Kramer* v. *Union Schools District* (1969) 395 U.S. 621 [23 L.Ed.2d 583, 89 S.Ct. 1886]; *Cipriano* v. *City of Houma* (1969) 395 U.S. 701 [23 L.Ed.2d 647, 89 S.Ct. 1897]; and to residents who could not afford to pay a poll tax (*Harper* v. *Virginia Bd. of Elections* (1966) 383 U.S. 663 [16 L.Ed.2d 169, 86 S.Ct. 1079]).

place of residence unnecessarily burdens their right to vote, particularly in view of their alleged indigent status, and, consequently, their restricted mobility. (See *Jolicoeur v. Mihaly, supra,* 5 Cal.3d 565, 571.)

Does respondent therefore assert a compelling interest in rejecting appellants' affidavits? Further, is it necessary for respondent to reject the affidavits in order to serve its objectives or are there alternative means which will not restrict appellants' right to vote?

 Respondent urges that it has a compelling interest in requiring appellants to list known residential addresses since the location of a voter's domicile determines which measures appear on the ballot the voter casts. Respondent states, "Each ballot style reflects a distinct combination of ballot measures and candidates and is dependent upon the political subdivision in which the voter's address is located." Respondent also claims it is interested in preventing the importation of voters in close elections and in preserving the concept of political community. Federal courts have indeed found that states have compelling interests in preventing voting fraud and in maintaining an orderly election procedure. (*Dunn v. Blumstein, supra,* 405 U.S. 342-344 [31 L.Ed.2d at pp. 284-285]; *Kollar v. City of Tucson, supra,* 319 F.Supp. 485.)

Nevertheless, do the means justify the ends in the instant case? We conclude they do not. Respondent's election goals do not warrant its refusal to register appellants to vote.

With regard to the interest in preventing fraudulent voting, respondent presented no evidence that appellants were more likely to commit fraud than persons who were not homeless. Without such evidence, the status of homelessness raises no presumption that homeless persons are more prone to commit voter fraud than any other group. (*Pitts v. Black, supra,* 608 F.Supp. 702.)

Appellants further point out the existence of a statutory framework in California to deter dual registration and other voter fraud problems.[3] There is no reason to believe that these statutes would not be effective to deter fraud by a class of homeless registrants. It may have been feasible in 1850 to influence the outcome of an election by rounding up the impecunious and

---

[3]Pertinent statutes include Elections Code sections 29200 (mandating imprisonment for illegal registration), 29640 (punishing by imprisonment fraudulent voting), 701, subdivision (g) (giving the county clerk the authority to cancel the registration of a person who has provided a postal address where mail is undeliverable), and 800 (mandating the county clerk to conduct a preelection residency confirmation procedure). (See *Pitts v. Black,* 608 F.Supp. at pp. 706-707.)

the thirsty, furnishing them with free liquor, premarked ballots, and transportation to the polls; to do so now, if possible at all, would require the coordinated skills of a vast squadron of computer technicians. [Observation of Justice Mosk in *Ramirez* v. *Brown* (1973) 9 Cal.3d 199, 214 (107 Cal.Rptr. 137, 507 P.2d 1345), revd. sub. opn. *Richardson* v. *Ramirez* (1974) 418 U.S. 24 (41 L.Ed.2d 551, 94 S.Ct. 2655).] The disenfranchisement of appellants must be justified, if at all, on some other ground. (*Pitts* v. *Black, supra,* 608 F.Supp. 702.)

Respondent's other primary concern is administrative feasibility. It asks how it can, as a practical matter, handle affidavits of registration which on their face do not list as residences places where people reside. First of all, there is no statutory authority for the proposition that a residence cannot be a place where there are no living facilities. In other words, the old adage, "A man's home is where he makes it," is not statutorily proscribed. We therefore agree with appellants that whether people "sleep under a bush or a tree or in the open air is immaterial regarding their right to vote." The type of place a person calls home has no relevance to his/her eligibility to vote if compliance with registration has been achieved, that is, the designation of a fixed habitation, the declaration of an intent to remain at that place and to return to it after temporary absences, and the designation of an address where mail can be received. (Elec. Code, §§ 200, subd. (b), 500.)

Respondent concedes it is not necessary to live in a house or apartment in order to be allowed to vote. It further states that the standard for establishing a residence for voting purposes found in *Pitts* v. *Black, supra,* 608 F.Supp. 696, is an appropriate standard for determining the residence of a homeless person.

*Pitts* resolves respondent's asserted administrative dilemma of ascertaining a person's election precinct when he/she does not live in a house or apartment or any other building. The federal court there found that it was not administratively infeasible to register homeless individuals to vote who lived in a city park which had no postal address and which spread over several election districts. As long as a homeless person could identify a specific spot within the park where he/she regularly slept, such as a park bench, election officials would be able to determine that person's election district. (Pp. 703, 706.) Furthermore, the court found that the identification of a specific "home base" within a district together with the designation of a place where messages could be received satisfied a stringent domicile standard. (Pp. 703, 710.)

Similarly, although Fig Tree Park has no building numbers, respondent can identify an election precinct for appellants. This is particularly feasible

as the park encompasses a small geographical area. Appellants' designation of a fixed premises and a post office box also establishes their domicile within a particular locality. This, in turn, allows them to vote without disturbing the integrity of the political community.

Admittedly, allowing appellants to vote produces a different set of circumstances for respondent to deal with and may result in additional administrative burdens. However, respondent has not only failed to show that registering appellants has created a situation incapable of administrative resolution, it has not shown that any administrative burdens it may face outweigh appellants' fundamental interest in participating in the electoral process.

It can be argued that permitting the "homeless" to vote will impart a sense of responsibility to those people by giving them a political stake in their future and a sense of caring about their community. Unlike other minority groups or disadvantaged persons, the "homeless," by the very nature of their living circumstances, have been unable to exercise any political influence in order to make their particular problems and needs known.

It is patently unjust that society ignores the homeless and yet also denies them the proper avenues to remedy the situation. Even more compelling, the denial of the vote to the "homeless" denies them electoral power. Powerlessness breeds apathy, and apathy is the greatest danger to society.

■ Finally, does respondent's particular action in the present case constitute discrimination against a class of persons whom appellants label either as homeless or indigent? No. We decide only that respondent has not asserted constitutionally sufficient grounds which justify its refusal to register appellants or any other persons establishing their home base at Fig Tree Park.

We agree with respondent that appellants presented no proof that respondent systematically refuses to register all persons in the county who are homeless or do not live in traditional homes. Moreover, the record from superior court indicates that the sole basis for respondent's refusal to accept appellants' registration affidavits was appellants' alleged nonresidency. Since restrictions relating to residency apply to both indigents and nonindigents, it was necessary for appellants to show that respondent was selectively enforcing state registration requirements on the basis of wealth. (*San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1, 22-23 [36 L.Ed.2d 16, 36-37, 93 S.Ct. 1278].) Appellants apparently offered no evidence in lower court as to what effect indigency has had on the ability of the homeless

to vote in the county or of their own indigency or their inability to secure housing in Santa Barbara.[4]

■ Nonetheless, the Equal Protection Clause prohibits using the affluence of the voter as an electoral standard since voter qualifications have no relation to wealth. (*Harper* v. *Virginia Bd. of Elections, supra,* 383 U.S. at p. 666 [16 L.Ed.2d at p. 172].) A citizen who is a qualified voter is no more nor no less so because he or she lives in an unconventional place. " 'This is the clear and strong command of our Constitution's Equal Protection Clause. This is an essential part of the concept of a government of laws and not men. This is at the heart of Lincoln's vision of government of the people, by the people and for the people. The Equal Protection Clause demands no less than substantially equal representation for all citizens, of all *places* as well as of all races.' " (*Id.,* at pp. 667-668 [16 L.Ed.2d at p. 173].) Denying the opportunity to vote to a resident merely because he or she cannot afford housing denies a citizen's vote on the basis of economic status and is therefore an impermissible basis for determining the entitlement to vote.

We conclude that appellants are entitled to a writ of mandamus directing respondent to allow appellants to register to vote on the ground that their submitted affidavits of registration comply with state registration laws. We further conclude that respondent's refusal to register appellants is not necessary to promote respondent's proffered election goals and is therefore violative of appellants' right to vote under equal protection standards.

The judgment appealed from is reversed and remanded to superior court for the issuance of a writ and the determination of costs at trial and on appeal.

Gilbert, J., and Abbe, J., concurred.

---

[4]A superior court hearing transcript was not included in the record on appeal.