[No. A040661. First Dist., Div. Four. July 28, 1989.]

JOSEPH S. HORWATH et al., Plaintiffs and Appellants, v.
CITY OF EAST PALO ALTO et al., Defendants and Respondents.

COUNSEL

David A. Self, Douglas Y. Dang, Barbara R. Adams, Self, Dang & Wah and Self, Wah & Overstreet for Plaintiffs and Appellants.

Tesfaye W. Tsadik and Stuckey & Johnson for Defendants and Respondents.

OPINION

**ANDERSON, P. J.**—We decide in this opinion that the City of East Palo Alto's (City) failure to comply fully with statutory requirements governing preparation of an impartial analysis of a proposed ballot measure does not invalidate the subsequently enacted rent control ordinance or its rent rollback provision. Accordingly, the appellants,[1] certain owners of rental property in East Palo Alto, are not entitled to a writ of mandate commanding respondents City and its Rent Stabilization Board (Board) to refrain from enforcing the ordinance and the rollback.

### I. *Factual Background*

### A. *Rent Stabilization Ordinances*

In May 1984 the East Palo Alto City Council adopted the Rent Stabilization and Eviction for Good Cause Ordinance (Ordinance No. 17-83). Its

---

[1] Appellants herein are: Joseph S. Horwath and Anthony E. Horwath, partners in Horwath Associates; Barbara J. Hurley; William T. Hurley; William M. Levin; Lucille W. Mellish; William J. Mellish; John Moran and Kathleen Moran, doing business as J & K Moran Co.; Newell-Martin A.B., a California Limited Partnership; Marjorie A. Saunders; Robert A. Saunders; Deborah L. Savage; Michael G. Savage; Ray Willingham; Gary Zaccor; Scott Zaccor; and 301 O'Keefe Investments.

stated purpose was "to protect residential tenants in the City from unreasonable rent increases by discouraging speculation in rental property and stabilizing rent increases; to protect tenants from arbitrary, discriminatory or retaliatory evictions; and at the same time to assure landlords both a fair return and rental income sufficient to cover costs of maintenance and operating expenses as well as the costs of capital improvements to their rental properties." (Ord. No. 17-83, § 3.) By its terms Ordinance No. 17-83 expired April 30, 1986. (Ord. No. 17-83, § 20.)

The ordinance created the Board to administer the rent control scheme (Ord. No. 17-83, § 6) and established a base rent ceiling[2] for each rental unit to function as a reference point for future rent adjustments. Further, the ordinance permitted an annual general adjustment (AGA) tied to the residential rental component of the "Consumer Price Index."[3] (Ord. No. 17-83, § 11.A.) The ordinance directed the Board to compute the AGA in May; landlords were to receive notice of adjustments no later than June 15, 1984, and June 30 of each subsequent year. (*Ibid.*) A landlord could then collect or charge the adjusted rent after giving each tenant 30 days' advance notice. (*Ibid.*) Apparently, there were AGA increases of 9 percent and 8 percent for 1984 and 1985 respectively.

In January 1986 the city council voted to submit an amended version of Ordinance No. 17-83 to the voters at the upcoming general municipal election. The written proposal discussed at the January meeting defined base rent as "the lawful rent actually due and payable on April 1, 1983 *plus the 9% general adjustment for 1984 and 8% general adjustment for 1985*." (Original italics.) However, the minutes indicate that the amended ordinance as adopted (referred to as "Measure A" on the ballot) set the base rent as the rent in effect on April 1, 1985, thereby reflecting the 1984 (9 percent) but not the 1985 (8 percent) increase. Thus, the new base rent resulted in an 8 percent rent rollback.

The voter information pamphlet distributed prior to the April 1986 election contained a "Summery [*sic*] of Measure A," signed by Robert W. Johnson, city attorney, as well as an "Impartial Analysis of Measure A," signed by Robert Johnson, city attorney, by Tesfaye W. Tsadik. These materials did not discuss the rent rollback; the voter pamphlet did not include the actual text of Measure A, but voters could request a copy by

---

[2] Defined as "the lawful rent actually due and payable on April 1, 1983 under the periodic terms of the rental agreement." (Ord. No. 17-83, § 10.A.)

[3] Specifically, the ordinance allowed an AGA "based upon 100 percent of the percent change in the residential rental component of the Consumer Price Index for the year period ending the month of April immediately preceding the rent adjustment date." (Ord. No. 17-83, § 11.A.)

mail. The voters adopted Measure A in April 1986. On April 28, the Board informed all landlords that commencing May 1, rents would be rolled back to the April 1, 1985, level.

## B. *Appellants' Lawsuit*

On January 28, 1987, appellants petitioned for a writ of mandate and sought declaratory and monetary relief, all in connection with the respondents' enforcement of the rent rollback. In particular, the petition asked for a writ commanding respondents to (1) refrain from enforcing Measure A in its entirety, as well as its rent rollback clause; (2) restore the 1985 AGA and (3) recalculate the AGA for 1986 and all future years. Appellants asserted that the ordinance as enacted was invalid because the city attorney did not explain Measure A's impact on existing law (i.e., the rollback) as required by the California Elections Code.[4]

Respondents demurred to the complaint, arguing with respect to the mandamus petition that the statute of limitations set forth in section 5025,[5] in addition to the equitable principle of laches, barred that claim. The court overruled the demurrer to the mandamus action, explaining its decision as follows: "The purpose of that statute . . . is to prevent the distribution of election materials that are misleading. . . . [¶] [T]he gravamen of his complaint in the first cause of action is that you've impaired his right to vote by failing to give . . . the electorate sufficient information on which to exercise their right to vote, and it isn't 5025 that's going to bar an action for that

---

[4] All statutory references are to the Elections Code unless otherwise indicated.

In particular, appellants have focussed on the city attorney's duty to prepare an impartial analysis of Measure A, as mandated by section 5011. This section reads in relevant part as follows: "Whenever any city measure qualifies for a place on the ballot, the governing body may direct the city clerk to transmit a copy of the measure to the city attorney, unless the organization or salaries of the office of the city attorney are affected. The city attorney shall prepare an impartial analysis of the measure showing the effect of the measure on the existing law and the operation of the measure."

Additionally, section 4018 as it read prior to the April 1986 election required a city attorney under certain circumstances to prepare a synopsis of the ordinance to be mailed to the voters in lieu of the entire ordinance. This provision did not, however, further detail the contents of such a synopsis.

[5] This section reads in relevant part: "Not less than 10 calendar days before the clerk submits the official election materials referred to in Sections . . . 4018 [and] 5011 . . . for printing, the clerk shall make a copy of the material available for public examination in the clerk's office. . . . [¶] During the 10-calendar-day examination period provided by this section, any voter of the jurisdiction in which the election is being held, . . . may seek a writ of mandate or an injunction requiring any or all of the materials to be amended or deleted. A peremptory writ of mandate or injunction shall be issued only upon clear and convincing proof that the material in question is false, misleading or inconsistent with the requirements of this chapter, and that issuance of the writ or injunction will not substantially interfere with the printing or distribution of official election materials as provided by law."

impairment. . . . [¶] Certainly, the valid argument or explanation that's required to be set forth by the city attorney . . . gave absolutely no guidance to any voter in East Palo Alto of what was involved in this particular provision, so we're somewhere south of 5025. [¶] You can't rely on 5025 . . . when an action is brought because you've gone ahead, and by virtue of the failure to comply, enacted an ordinance that allegedly takes without due compensation from the people who do business in your city . . . ."

The writ petition proceeded to hearing, respondents again contending section 5025 and laches compelled denial of the writ. Respondents submitted written materials which included declarations from civic leaders stating that they discussed the rent rollback at numerous community meetings. The chairman of the Board declared that he and others distributed a leaflet advertising the rollback to "almost all residential homes, public places like the supermarket and civic places in East Palo Alto." This time a judge in a different department decided against appellants, ruling they were "just too late" and further holding that section 5025 controlled.

## II.  *Section 5025 Does Not Apply*

■ At the outset we resolve any misperceptions there may be about whether the city attorney met his responsibilities under section 5011. Clearly, by omitting any discussion of the rollback, the city attorney failed to prepare an impartial analysis of Measure A within the meaning of section 5011.

■ Also, as a preliminary matter and because both rulings in this litigation centered on the applicability of section 5025, we clarify that section 5025 by its terms only governs preelection activities. Its purpose is to facilitate timely correction of preelection ballot errors by allowing a complaining voter to amend or delete offending materials, a remedy which appellants did not, and perhaps could not, seek.[6]

Having passed the section 5025 hurdle, appellants would have us declare the election void as hopelessly riddled with the effects of misleading official ballot materials. Although we, too, are somewhere south of section 5025, that somewhere leads nowhere because the section 5011 violation will not, without more, sustain appellants' petition.[7]

---

[6]Nothing in the record indicates that any individual plaintiff was a resident of East Palo Alto. The code defines "voter" as any elector who is registered to vote, an elector being "any person who is a United States citizen 18 years of age or older and a resident of an election precinct at least 29 days prior to an election." (§§ 17, 18.) The section 5025 remedy is only available to a voter "of the jurisdiction in which the election is being held."

[7]Although we reject section 5025 as a basis for resolving this case, our task on appeal is to determine whether the judgment is correct under any legal theory, regardless of consider-

### III. *Discussion*

Although several causes of action alleged in the complaint attack the substance of Measure A, the action before us instead challenges the fairness of the election process itself.  ▆ ▆▆ Appellants' attempt to use the vehicle of prohibitory mandamus[8] to contest the election on the theory that the enacting process was so infected by official misinformation about a vital element of the rent control legislation that the legislation must be invalidated.

In order to prevail in their request for extraordinary relief, appellants would have to convince us (1) they have no adequate legal remedy and (2) Measure A is unconstitutional and, thus, the City has a duty to halt its enforcement.

We begin our discussion by exploring the scope of traditional mechanisms for contesting elections to discern how appellants' complaint fits within this scheme, and conclude there is no statutory basis in California for challenging an election on the grounds urged here. Next, we turn to appellants' argument that the lawmaking defects here attained constitutional dimensions, thereby entitling them to extraordinary relief to halt enforcement of the unlawful ordinance. We reject this claim.

### A. *There is No Statutory Basis for Attacking the Postelection Effects of the Ballot Materials*

The election contest provisions set forth in section 20021 et seq. allow an elector of a given city or county to challenge an election held therein on six specified grounds.[9]  ▆ The main purpose of these provisions is "to as-

---

ations which may have spurred the trial court to its conclusion. (*State of Washington* ex rel. *Burton* v. *Leyser* (1987) 196 Cal.App.3d 451, 458 [241 Cal.Rptr. 812].)

[8] Ordinarily, mandamus is available to compel performance of a ministerial act where the petitioner is a beneficially interested party and has no "plain, speedy, and adequate remedy, in the ordinary course of law." (Code Civ. Proc., §§ 1085, 1086.) An official's affirmative obligation to perform encompasses a corollary obligation not to perform the duty in violation of the law. Thus the unlawful exercise of a ministerial duty can be restrained, and courts label the writ restraining such unlawful performance "prohibitory mandate." (*Planned Parenthood Affiliates* v. *Van de Kamp* (1986) 181 Cal.App.3d 245, 262-263 [226 Cal.Rptr. 361]; see also 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 233, pp. 856-858.) A court, thus, will issue a writ ordering officials to stop enforcing a provision which it finds unconstitutional. (See *Hardie* v. *Eu* (1976) 18 Cal.3d 371 [134 Cal.Rptr. 201, 556 P.2d 301].)

[9] Section 20021 reads: "Any elector of a county, city, or of any political subdivision of either may contest any election held therein, for any of the following causes: [¶] (a) That the precinct board or any member thereof was guilty of malconduct. [¶] (b) That the person who has been declared elected to an office was not, at the time of the election, eligible to that office. [¶] (c) That the defendant has given to any elector or member of a precinct board any bribe or

certain the will of the people and to make certain that mistake or fraud has not frustrated the public volition." (*Enterprise Residents etc. Committee* v. *Brennan* (1978) 22 Cal.3d 767, 774 [151 Cal.Rptr. 1, 587 P.2d 658].)

■ Courts have applied these provisions to candidate as well as ballot measure elections, and to special as well as general elections. (*Canales* v. *City of Alviso* (1970) 3 Cal.3d 118, 129 [89 Cal.Rptr. 601, 474 P.2d 417]; *Anderson* v. *County of Santa Barbara* (1976) 56 Cal.App.3d 780, 786 [128 Cal.Rptr. 707].) But they confine their inquiry to the matters prescribed in the provisions enumerating the grounds of contest. (*Maddux* v. *Walthall* (1903) 141 Cal. 412, 415 [74 P. 1026] [citing precedessor of § 20021]; see also *Williams* v. *McClellan* (1953) 119 Cal.App.2d 138, 143-144 [259 P.2d 12] [complaint which does not allege any of the enumerated causes does not state facts sufficient to constitute a cause of action].)

The cause designated in subdivision (c) of section 20021 and, in particular, the "other offense against the elective franchise" language, is pertinent to understanding how the section 5011 violation might square with the election contest mechanism. The relevant division 17 offense is found at section 29102, which proscribes the willful neglect, or knowing and fraudulent violation of, "any duty under the provisions of any law of this state relating to elections," by any person charged with its performance.

■ When a contestant seeking to overturn a ballot measure election, as opposed to a candidate election, relies on subdivision (c), he or she must demonstrate that the forbidden act affected the outcome. (See *Canales* v. *City of Alviso, supra,* 3 Cal.3d at p. 130, so holding where the act in question was the offering of valuable consideration to induce voting.) The court in *Canales* explained that although some of the subdivision (c) language implies that it refers only to a candidate election, "section 20089 provides that this and other provisions of the code 'shall also apply to the recount of votes cast on a ballot measure, insofar as they can be made applicable.'" (*Id.,* at p. 129.) By tying the subdivision (c) misdeed to the election result, the provision " 'can be made applicable,' to 'the recount of votes cast on a ballot measure,' . . . within the meaning of section 20089." (*Id.,* at p. 130.)

From this statutory scheme it becomes evident that an East Palo Alto elector could contest the Measure A election on the basis that the city attorney intentionally failed to disclose the rollback, in contravention of his

reward, or has offered any bribe or reward for the purpose of procuring his election, or has committed any other offense against the elective franchise defined in Division 17 (commencing with Section 29100). [¶](d) That illegal votes were cast. [¶] (e) That the precinct board in conducting the election or in canvassing the returns, made errors sufficient to change the result of the election as to any person who has been declared elected. [¶] (f) That there was an error in the vote-counting programs or summation of ballot counts."

duty under section 5011 to show the impact of the new base rent date on existing law. To win, the elector would have to demonstrate "that the result would have been different without [this] influence—i.e., [the misinformation] prevented the expression of the majority will." (*Canales* v. *City of Alviso, supra,* 3 Cal.3d at p. 130.)

From the facts of this case it is also evident that appellants have not used, and could not, use the section 20021 procedures. The election contest remedy is not available to appellants because they have neither alleged nor proven that they are electors of East Palo Alto, nor have they offered any proof that the deficient impartial analysis in fact affected the outcome of the vote. Under most circumstances, our analysis would end with the conclusion that appellants are not entitled to relief because they cannot maintain a statutory election contest. However, we do not think section 20021 could foreclose a prohibitory mandamus action, even by a nonelector, if a nonenumerated act alleged in the petition and affecting the electoral machinery itself rendered the resulting enactment unconstitutional. Appellants so allege, but we are not persuaded.

B.  █  *Failure to Comply Fully With Section 5011 Did Not Render the Rollback Unconstitutional*

The thrust of appellants' briefs is that the rollback provision was never put to the voters because the city attorney did not mention it in either the impartial analysis or the summary. This "significant" omission, in turn, deprived the electorate of its right to vote in an informed manner. Appellants emphasize they have been injured directly—i.e., suffered an 8 percent rent rollback—by enforcement of a law about which, for all practical purposes, the lawmakers knew nothing.

At oral argument appellants clarified that their constitutional right stems from the due process clause of the Fourteenth Amendment, not the right to vote. According to this theory, enforcement of the rollback deprives them of the 1985 eight percent general adjustment without due process. And the due process concern here is not the typical procedural concern with notice and an opportunity to be heard. Rather, the concern is with how the law was made—precisely whether the official misinformation so permeated the lawmaking process as to render it substantively invalid.

█  California courts recognize the general principle that an election cannot stand in the face of irregularity or illegality in the election process which affected the result—a departure from legal requirements that "in fact prevented 'the fair expression of popular will.'" (*Canales* v. *City of Alviso, supra,* 3 Cal.3d at p. 127; *Davis* v. *County of Los Angeles* (1938) 12 Cal.2d

412, 416 [84 P.2d 1034]; *Rideout* v. *City of Los Angeles* (1921) 185 Cal. 426, 430 [197 P. 74].) This overriding principle goes beyond the enumerated grounds set forth in section 20021, and can be viewed as encompassing a concern about fundamental fairness or due process in the election procedures themselves.[10]

We are mindful that the purpose of statutes like section 5011 is to foster a more informed electorate by supplying correct information about the measures appearing on any given ballot. (See *Young* v. *Gnoss* (1972) 7 Cal.3d 18, 25 [101 Cal.Rptr. 533, 496 P.2d 445]; *Hart* v. *Jordan* (1939) 14 Cal.2d 288, 291 [94 P.2d 808]; *Patterson* v. *Board of Supervisors* (1988) 202 Cal.App.3d 22, 29 [248 Cal.Rptr. 253].) And we recognize that the government's analysis is likely to carry greater weight with voters than partisan campaign literature simply because it is the government that prints and distributes the voter pamphlet to all registered voters. (See *Gebert* v. *Patterson* (1986) 186 Cal.App.3d 868, 874 [231 Cal.Rptr. 150].)

The question then becomes whether the section 5011 violation prevented the voters from freely and fairly making their choice at the polls. The courts in *Davis* and *Rideout* entertained actions to void the local elections in question because of deviations from directory provisions of the state election laws. *Rideout* involved defective ballots (failure to print the words "Municipal Ticket" on the back of ballot, and allegedly improper type size); *Davis* entailed a misdescription in the notice of election. Both reviewing courts upheld the trial court's finding that the deficiencies did not affect the outcome. (*Rideout* v. *City of Los Angeles, supra,* 185 Cal. at pp. 432-434; *Davis* v. *County of Los Angeles, supra,* 12 Cal.2d at pp. 426-427.)

Courts in other states, operating on the same general principles, have reached different results when deciding whether some aspect of the enacting process was misleading to the voters. In the two cases discussed below, resolution of the issue involved examination of other information forums in addition to the ballot statement.

In *Anne Arundel County* v. *McDonough* (1976) 277 Md. 271 [354 A.2d 788],[11] the Maryland Court of Appeals declared a referendum void because

---

[10] Plaintiff in *Davis* brought an action for injunction and declaratory relief, seeking, in part, to annul a special election. The opinion does not mention the state election contest provisions. The court in *Rideout* explained the procedural posture of that case as follows: "The two . . . cases are taxpayers' actions in the nature of equity proceedings to annul two special municipal elections held in the city of Los Angeles . . . and practically take the form of election contests." (*Rideout* v. *City of Los Angeles, supra,* 185 Cal. at p. 428.)

[11] Plaintiff property owners brought a preelection action to restrain the board of election supervisors from placing a referendum question on the ballot; the action, however, was decided after the election because of certain timing and logistical problems. The Court of Appeals

the ballot statement "was so inaccurate, ambiguous and obtuse, that an ordinary voter, of average intelligence, could not, in a meaningful and comprehending manner, have knowledgeably exercised his franchise when called upon to vote . . . ." (354 A.2d at p. 809.) State election laws required the ballot to contain a " 'condensed statement in understandable language' " of questions submitted to the voters. (*Id.,* at p. 798.) In reviewing the nonofficial, preelection publicity concerning the referendum, the court concluded it was "sparse, incomplete and generally outdated" and, thus, no substitute for the legal requirements. (*Id.,* at p. 808.) The dissent, on the other hand, viewed the preelection publicity differently: "the extent of pre-election publicity . . . was a sufficient supplement to the language of the ballot title to assure that the election would be a full and fair expression of the will of the voters." (*Id.,* at p. 811.) Noting also that although the question of sufficiency of the ballot summary is necessarily a matter of degree, the dissent reasoned, "it is nonetheless certain that considerable reliance must be placed on outside sources of publicity to fill in the details." (*Ibid.*)

In *Turner* v. *Barnhart* (1972) 83 N.M. 759 [497 P.2d 970], contestants in New Mexico sought to void an election because the ballot did not contain the full text of the ordinance. The relevant statute stated the ballot " 'shall contain the text of the ordinance' " in question. The Supreme Court of New Mexico did not nullify the election, commenting that the voters "did speak" on the fluoridation issue in question and "with the amount of publicity that attended the election on this issue" the court concluded it could not "justify holding the election void because of the so-called irregularities. . . ." (497 P.2d at p. 973.)

■ With these cases and principles in mind, we can fashion a model for deciding whether the defective ballot measure analysis triggers invalidation of Measure A on due process grounds. Determination of how much process is due in a local, direct decisionmaking context—where the complained-of irregularities consist of omissions, inaccuracies or misleading statements in the ballot materials—will depend on whether the materials, in light of other circumstances of the election, were so inaccurate or misleading as to prevent the voters from making informed choices. In conducting this inquiry courts should examine the extent of preelection publicity, canvassing and other informational activities, as well as the substance or content of such efforts. The ready availability of the text of the ordinance, or the official dissemination and content of other related materials, such as arguments for

reviewed the case as a preelection challenge, construing the statutory requirements relating to the ballot contents to be mandatory rather than directory. Nonetheless, it also reviewed defendant's evidence on the issue of preelection publicity, and concluded even if it were to consider the statutory requirements as "directory," it would still reach the same conclusion. (*Anne Arundel County* v. *McDonough, supra,* 354 A.2d at pp. 807-809.)

or against the measure, will also bear on whether the statutory noncompliance rendered the election unfair. Finally, courts should take into account the materiality of the ommission or other informational deficiency. Flaws striking at the very nature and purpose of the legislation are more serious than other, more ancillary matters. (See discussion in *Tinsley* v. *Superior Court* (1983) 150 Cal.App.3d 90, 108-109 [197 Cal.Rptr. 643], concerning sufficiency of ballot title and summary prepared by Attorney General for state initiative.) Of course "significance" is often in the eyes of the beholder, and can become a political, rather than a judicial, question if we delve far beyond the nature and essential purpose of the measure.

Applying these guidelines, we first observe that the responsibility for voter education is not the government's alone; other segments of society, including the media, interest groups and the voters themselves, share this responsibility. As the Supreme Court pointed out in *Young* v. *Gnoss* (1972) 7 Cal.3d at page 25, "voter education is by no means the responsibility of the state alone," nor is the state duty bound to " '. . . provide perfect conditions under which [the right to vote] is exercised. . . .' " *Young* involved a constitutional challenge to the durational residence requirements and parallel closing date of the voter registration books; the respondent counties argued that their statutory obligation to mail certain voter information was a compelling government interest justifying the residence requirements. The Supreme Court thought otherwise: "In view of the broad exposure of the voting public to both information and persuasion bearing on the candidates and the issues via the newspapers, radio and television, particularly during the final month of each political campaign, we cannot hold that the mailing of the above-described materials is a compelling governmental interest. . . ." (*Id.*, at p. 26.)

Although the issues are different here, we think the reasoning in *Young* is persuasive on the constitutional ramifications of failure to comply with section 5011. In this case there was evidence that an informational leaflet boldly explaining that Measure A would roll rents back to the April 1, 1985, level was distributed to most residential homes, as well as public and civic locations in the City. Further, an article appearing in the local newspaper prior to the election mentioned the change in the base rent date, and a number of civic leaders declared that they or others discussed the rollback at various community meetings.

Second, we reiterate that although the analysis itself did not pass section 5011 muster, the City did make the full text of Measure A available to interested voters *before* the election. To receive a copy, any voter had only to return a prepaid postcard furnished with the ballot pamphlet, and the City would mail the proposed ordinance free of charge. The ordinance itself

in straightforward terms established April 1, 1985, as the lawful base rent date.

Third, on the issue of materiality, the ballot summary and analysis accurately disclosed the purpose of Measure A and described in general terms its key components, except for the definition of the lawful base rent. The materials simply stated that the Board is empowered to set and adjust rent ceilings. Voters reading the ballot materials would know they were voting for or against a citywide scheme of rent control and good cause for eviction, to be administered by the Board, with mechanisms for annually adjusting the rent which were designed to protect the interests of both tenants and landlords.

This omission falls somewhere in between a minimal defect and one going to the core character and purpose of the proposed legislation. However, in light of what was disclosed, coupled with the extent of preelection publicity on the very topic of the rollback, as well as the availability of the full text of the proposed ordinance, we cannot conclude, on the record before us, that the City's misconduct was so egregious as to raise a presumption of unfairness. (See *Rideout* v. *City of Los Angeles, supra,* 185 Cal. at pp. 432-433.) Therefore, appellants have not, as a matter of law, met their burden, in attacking Measure A's constitutional validity, of showing unfairness in the election process.

The judgment is affirmed.[12]

Perley, J., concurred.

POCHÉ, J.—I concur solely on the ground that the trial court's finding of laches is amply supported by substantial evidence. In light of this conclusion I find no need to address the election-related issues discussed by the majority.

---

[12] Having resolved that appellants cannot pursue their mandamus action, we need not discuss the remaining laches argument.