Filed 5/24/16  P. v. Wright CA2/5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| THE PEOPLE, | B260216 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA361187) |
| v. | |
| RODERICK WRIGHT, | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of the County of Los Angeles, Kathleen Kennedy, Judge.  Affirmed.

Keker & Van Nest, John W. Keker, Eric H. MacMichael, Steven A. Hirsch and Elizabeth K. McCloskey for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General and Michael C. Keller, Deputy Attorney General, for Plaintiff and Respondent.

# INTRODUCTION

A jury found defendant and appellant Roderick Wright guilty on two counts of perjury, one count of filing a false declaration of candidacy, and five counts of fraudulent voting. On appeal, he contends our prior decision in *People v. Superior Court* (*Wright*) 197 Cal.App.4th 511, (*Wright*)—which interpreted and applied the conclusive presumption in Elections Code section 2026[1]—constituted a manifest misapplication of existing legal principles that resulted in a substantial injustice. He further contends: even under our interpretation of section 2026, he established, as a matter of law, entitlement to the conclusive presumption in that section; the trial court committed prejudicial instructional error as to the perjury charge in count one; the prosecutor engaged in prejudicial misconduct during argument; the jury's finding that he acted with the requisite criminal intent was not supported by sufficient evidence; and his allegedly false statement that he met the residency requirement for the office of State Senator was true and immaterial.

We hold defendant is barred under the law of the case doctrine from relitigating the issue decided in *Wright, supra,* 197 Cal.App.4th 511. We further hold the trial court did not commit the instructional error claimed and that defendant's statement that he met the residency requirement for office was false and material. And, as we explain below, we conclude that defendant forfeited his other contentions on appeal. We therefore affirm the judgment of conviction.

---

[1]     All statutory references are to the Elections Code unless otherwise specified.

# FACTUAL BACKGROUND

## A.    Prosecution's Case

### 1.    868 Glenway Drive

In 1977, defendant purchased a residential apartment complex located at 868 Glenway Drive in Inglewood (Glenway complex).  The complex consisted of six-units:  a building with four two-bedroom apartments—units one through four; a free-standing three-bedroom house—unit five; and a one-room bachelor apartment that had been built in the garage for the house—unit six.  Between 2000 and 2010, the Glenway complex was located in the 25th State Senate District.

### 2.    4556 Don Milagro Drive

In 2000, defendant purchased a single family residence in Baldwin Hills located at 4556 Don Milagro Drive (Don Milagro residence).  The home was two stories and had two bedrooms, two baths, and a den.  From 2000 to 2010, the Don Milagro residence was located in the 26th Senate District.

### 3.    Defendant's Agreement with Sanders

In 1985, Wanda Sanders moved into the house—unit five—at the Glenway complex with defendant's father Leo. [2]  When Leo died in 1991, Sanders continued to live in the house by herself and pay rent to defendant.

Defendant claimed to have entered into a letter agreement with Sanders in January 2007 by which defendant raised her rent from $800 to $850 a month.  The agreement also provided that defendant would "have the use of a room as a dwelling place" and that Sanders was to continue to mail her rent to the Don Milagro residence.

---

[2]    Sanders considered defendant as a step-son.

3

### 4. *Defendant's 2007 Voter Registration Form*

On March 14, 2007, defendant submitted to the Los Angeles County Registrar-Recorder/County Clerk (County Registrar) a voter registration form signed under penalty of perjury. In the space on the form calling for the "address where you live," defendant entered "868 Glenway Drive," unit five.

### 5. *Defendant's 2008 Declaration of Candidacy for State Senator for 25th District*

A candidate for public office must fill out and submit a declaration of candidacy form under penalty of perjury stating that he or she meets "all the statutory and/or constitutional qualifications for this office, including but not limited to citizenship, residency . . . ." A candidate running for public office must also fill out a candidate registration and qualification form stating, inter alia, that he or she is "aware of the qualifications for office . . . ." According to a representative of the County Registrar, one of the qualifications for running for a state office is to have a residence located in the district of the office.

In February 2008, defendant filled out and submitted under penalty of perjury a declaration of candidacy form for the office of State Senator for the 25th District. In the form, defendant stated that he met all the qualifications for office, including the requirement that he reside in the 25th District. Defendant also filled out a registration and qualification form that listed his "residence street address" as "868 Glenway Drive, #5."

### 6. *Defendant Voted Five Times as Resident of 25th District Between 2008 and 2009*

Voter registration records showed that defendant voted by mail in the 25th Senate District, using the 868 Glenway Drive, unit five, address in the elections held on February 5, 2008; June 3, 2008; November 4, 2008; May 19, 2009; and September 1,

4

2009. Defendant was listed as a candidate for State Senator for the 25th District on the sample ballots distributed for the June 2008 and November 2008 elections and he was a State Senator when he voted in May 2009 and September 2009.[3]

### 7. Investigation

In December 2008, Los Angeles County District Attorney Investigator Jose Cisneros was assigned to investigate a complaint concerning defendant's residency. On December 8, 2008, he drove by the Don Milagro residence and observed a black Lincoln LS parked in front. Using the license plate for that vehicle, the investigator verified that it was registered to defendant at the Don Milagro address. The investigator next went to the Glenway complex and interviewed Sanders who told him that defendant did not live there.[4]

Since 2003, Rene Torres lived in unit six, the one-room bachelor apartment in the garage at the Glenway complex, initially by himself and later with his wife, Martha Cervantes, and their two children. During the entire time he lived there, Torres saw defendant at the Glenway complex only five or six times. He did not know whether defendant ever stayed overnight at Sanders's house, but he did see a flight attendant, Felicia Porter, stay at Sanders's house when she was not working. Cervantes lived with Torres in unit six for seven years. During that time, she only saw defendant once at the Glenway complex, in connection with a plumbing problem.

From November 2007 to 2010, Micah Green lived in unit four of the Glenway complex. During the time he lived there, he mailed his rent to the Don Milagro residence. He did not believe anyone lived with Sanders while he lived in unit four. The

---

[3] Defendant was elected State Senator in November 2008 and was sworn in on December 2, 2008.

[4] At trial, Sanders stated that she was unaware whether defendant ever used a room in the house. Sanders did not recall ever sharing her bathroom with defendant or seeing him use the kitchen in 2007. Sanders purportedly did not know whether defendant was living at her house in 2008 or 2009, even though she was retired and spent a great deal of time at home.

5

only time Green saw defendant at the Glenway complex was when defendant came to Green's unit to schedule when Green would move out. Green typically arrived home from work at around 2:30 a.m. and he did not recall ever seeing defendant's Lincoln parked at the complex at that time in the morning.

Wilma Callender lived on Don Milagro Drive in Baldwin Hills for "50 plus years." She described her neighborhood as "middle class" and her neighbors as "doctors[,] lawyers [, and] musicians." The homes on Callender's street had views of the city and the hills. Defendant lived across the street from Callender. Callender had seen a Cadillac and a Maserati parked in defendant's garage and a Lincoln parked in front of his house. Callender also observed a woman driving a BMW occasionally visit defendant at his house.

Mary Bryant lived on Don Milagro Drive in Baldwin Hills since 1970. Her neighbors were "mostly professional people" and she enjoyed a partial city view from her house. On occasion, when she saw defendant standing outside his garage as she was pulling out of her driveway, she waived to him and said "hello." On one occasion, she heard a loud alarm go off at defendant's house.

Hiwot Shenkute lived on Don Milagro Drive in Baldwin Hills since 2004. Defendant was her neighbor. She saw defendant in the middle of the day and said "hi" to him. She also observed him driving a gray Lincoln. Defendant was the only person she saw at his house. In approximately 2012, Shenkute had a conversation with defendant about trimming a tree in defendant's backyard that was damaging a joint fence between their two properties.

On September 16, 2009, a team of District Attorney investigators executed a search warrant at the Don Milagro residence. About 30 seconds after investigators knocked on the door, defendant opened the door wearing only a T-shirt and underwear. The investigators conducting the search took videotape and photographs documenting the items found inside the Don Milagro residence. Among other things, the photographs showed: a Maserati and a Cadillac in the garage, as well as a Lincoln parked in front of the house; awards that defendant had received on display in one of the rooms; personal

6

photographs on display in one of the rooms; a refrigerator and freezer stocked with various food items; a closet full of suits and ties; drawers full of personal items such as paper money, coins, cufflinks, watches, and keys; drawers with folded dress shirts and belts inside; a bathroom with personal grooming items on the vanity and a medicine cabinet filled with over-the-counter and prescription drugs. Investigators also found three handguns registered to defendant, including one recovered from under a bed and another recovered in a bedroom closet.

On that same day, a team of District Attorney investigators executed a search warrant at unit five of the Glenway complex. A member of the team videotaped and photographed the inside of the unit to document the items found inside. Porter, the flight attendant who sometimes stayed at Sanders's house, answered the door. Sanders was not home. Only women's clothes were found in the closet and women's shoes were found under the bed, but no men's clothing was found. There were personal items in the bathroom, including prescription pill bottles with Sanders's name on them. Billing statements with Sanders's name on them were recovered, but there were no documents with defendant's name on them. The investigators did not locate the January 2007 letter agreement that raised Sanders rent and allowed defendant to use a room at the house as a dwelling place.

In 2000, defendant opened a residential account in his name with the Department of Water and Power pursuant to which electricity and water were supplied to the Don Milagro residence. In 2006 and 2007, the electricity and water usage at that location were consistent, but in 2008 and 2009, after defendant was elected to the State Senate, the usage of electricity and water at the Don Milagro residence decreased substantially.

Sanders had a residential account with Southern California Edison pursuant to which electricity was supplied to unit five of the Glenway complex. Units one through four of the complex were supplied with electricity pursuant to a commercial account in defendant's name. The bill for the commercial account was sent to the Don Milagro residence. Water was supplied to the Glenway complex pursuant to an account in defendant's name and the billing address for that account was the Don Milagro residence.

7

The City of Inglewood required defendant to pay an annual business tax on the Glenway complex. If, however, the owner of a multi-unit apartment complex lived in one of the units and filed for an owner-occupier exemption, the City would not include that unit in its annual tax calculation. Between 2003 and 2009, defendant did not claim the owner-occupier exemption.

Defendant's daughter attended Hamilton High School from approximately 2004 to June 2008. The high school's records listed an emergency contact number for defendant as one of the phone lines at the Don Milagro residence.

Defendant worked as a legislative aide at the State Senate between 2005 and 2008. When he was hired, he filled out a card that asked for personal information including address, social security number, and birth date. Defendant provided "4556 Don Milagro Drive" as his address.

Records of the security company that provided security services for defendant at the Don Milagro residence showed that on February 26, 2006, at 8:26 p.m., defendant had an activation of his alarm system. When the security company contacted him by telephone at the property, he provided his password and indicated that everything was "okay." Those records also showed that between 2006 and 2012 there were several other instances in which an activated alarm required defendant to call the security company and provide his password.

At the time of trial, AT&T was billing defendant for three land lines that provided telephone service at the Don Milagro residence. AT&T's records showed that calls were being made from one of those land lines at various times of the day and night on randomly selected dates between 2007 and 2009.

### B.    Defendant's Case

Cine Ivery had known defendant for over 20 years. At the time of trial, she was employed as defendant's chief of staff. According to Ivery, defendant purchased the Don Milagro residence in July 2000. At the time, Ivery was working for defendant—who was then a State Assemblyman—as a district director. Ivery located the Don Milagro

8

residence for defendant and helped him move there using her car, a truck, and a "roll off" bin. When defendant left the State Assembly in 2002, Ivery continued to work for him as he acted as a consultant for the State Assembly. Between 2002 and 2008, when defendant was elected to the State Senate, Ivery occasionally worked through the night at the Don Milagro residence.

Ivery explained that, prior to opening his State Senate campaign in January 2008, defendant began preparations to move to the Glenway complex. Ivery assisted him in moving light items to the Glenway complex. Following his election to the State Senate, defendant conducted fundraising activities from the Don Milagro residence because he was not permitted to do so from his office in Sacramento. Ivery estimated that, after being elected as State Senator, defendant spent 80 to 85 percent of this time in Sacramento.

According to defendant, after purchasing the Glenway complex in 1977, he moved into unit six for about 18 months. In either 1978 or 1979, defendant purchased a residence at 9316 4th Avenue in Inglewood. Over the next several years, defendant moved into unit six, four or five different times, for periods of six to eight months. The last time he lived there was 1988 or 1989.

A member of defendant's family had always lived at the Glenway complex. In about 1985, defendant's father moved into unit five of the Glenway complex and lived with Sanders until his death in 1991. Defendant's brother also lived in unit six for about a year. In addition, Sander's son lived in that unit for some unspecified period. Defendant owned the Glenway complex continuously since 1977 and had no intention of selling it.

Defendant purchased the Don Milagro residence in 2000 or 2001 primarily because there was a large room on the second floor that he wanted to convert into an office. But defendant admitted that, as part of the purchase transaction for the Don Milagro residence, he declared in mortgage documents that he intended to use the property as his principal residence. When defendant purchased the house, he sold his home on 4th Avenue in Inglewood to Ivery. Defendant used the office he built at the

Don Milagro residence to conduct political activities he could not conduct from his State Senate office in Sacramento. Defendant claimed he never intended the Don Milagro residence to be his domicile. He never registered to vote at that address, never used that address on his driver's license or passport, and never took a homeowner's exemption on the property. Defendant also ran a consulting business from an office at the Don Milagro residence and took out a business license for that address.

When defendant decided to run for State Senate, he considered running in the 26th District where the Don Milagro residence was located, but decided against it. He ultimately decided to run for the 25th District Senate seat. He therefore took steps to ensure that the Glenway complex in that district was his domicile. Initially, he thought he could occupy unit six, but Sanders had rented that unit to one of her friends. Because Sanders wanted to continue to collect the rent from unit six, defendant suggested that they share her house, unit five. They agreed Sanders would continue to collect the rent from unit six, pay for the gardener, and pay an increased rent of $850. In return, defendant would be entitled to share the house with her. Defendant therefore prepared a letter on January 7, 2007, memorializing their agreement. After signing the agreement, defendant moved personal items, such as toiletries, clothing, and books into unit five at the Glenway complex.

Defendant understood that if he had a tenancy, a key, free access to the property, and a right to remain there if he chose, he could claim unit five at the Glenway complex as his domicile for purposes of voter registration. Thus, when he filled out his voter registration form, he believed he was listing the address that he considered to be his legal domicile. Defendant claimed his understanding concerning his domicile was based, in part, on his experience running voter registration drives and working on political campaigns, the practices of other state legislators, and the case of *Fenton v. Board of Directors* (1984) 156 Cal.App.3d 1107 (*Fenton*). Defendant also understood that once he took office in 2008, his domicile was conclusively presumed to be the location listed on his voter registration card based on section 2026.

10

## PROCEDURAL BACKGROUND

Defendant was charged in an indictment in counts one and two with perjury in violation of Penal Code section 118, subdivision (a); in count three with filing a false declaration of candidacy in violation of section 18203, subdivision (a); and in counts four through eight with fraudulent voting in violation of section 18560, subdivision (a). Defendant pleaded not guilty to all counts.

The jury found defendant guilty on all counts. The trial court suspended imposition of sentence and placed defendant on formal probation for three years. The trial court ordered defendant to serve 90 days in jail and to perform 1500 hours of community service. The court also directed defendant not to hold any public office in the State of California pursuant to Government Code section 1021.

## DISCUSSION

### A. Law of the Case

#### 1. *Background*

Prior to trial, defendant moved under Penal Code section 995 to set aside the indictment, arguing, inter alia, that counts 7 and 8—fraudulently voting on two occasions in 2009—should be dismissed because under section 2026, he was entitled to a conclusive presumption that the residence address on his voter registration form—868 Glenway Drive, unit five, in the 25th District—was his domicile for purposes of voting in that district.[5] The trial court ruled that the conclusive presumption in section 2026 applied and prevented prosecution on counts 7 and 8.

The prosecution filed a petition for writ of mandate in this court seeking an order reinstating counts 7 and 8. (*Wright, supra,* 197 Cal.App.4th at p. 516.) We issued an

---

[5] Section 349, subdivision (a) provides: "'Residence' for voting purposes means a person's domicile."

order to show cause directing defendant to address why the relief prayed for in the petition should not be granted. (*Id.* at 514.)

Following briefing and oral argument, we issued a unanimous published opinion granting the petition and directing the trial court to reinstate counts 7 and 8. (*Wright, supra,* 197 Cal.App.4th at p. 517.) In our opinion, we rejected the trial court's interpretation of section 2026, reasoning as follows: "Section 2026 provides, 'The domicile of a Member of the Legislature . . . shall be conclusively presumed to be at the *residence* address indicated on that person's currently filed affidavit of registration.' (Italics added.) The Legislature has articulated a stark difference between a person's domicile and a person's residence. [¶] A domicile is described as a 'fixed' place of habitation—one in which the person has an 'intention of remaining' or, if absent, an 'intention of returning.' (§ 349, subd. (b).) Importantly, '[a]t a given time, a person may have *only one* domicile.' (*Ibid.*, italics added.) [¶] On the other hand, '[t]he residence of a person is that place in which the person's habitation is fixed for some period of time, but wherein he or she does not have the intention of remaining.' (§ 349, subd. (c).) Thus, '[a]t a given time, a person may have *more than one* residence.' (*Ibid.*, italics added.)" (*Wright, supra,* 197 Cal.App.4th at p. 515.)

"Reading these statutes together, the conclusive presumption set forth in section 2026 is triggered when the legislator lists one of his or her *residences* when he or she fills out the section of the voter registration form that requires the legislator to write the 'ADDRESS where [the legislator] live[s].' For example, the presumption would not be triggered if the legislator were to indicate he or she lived at an address that corresponded to a local McDonald's restaurant, or the home of another in which the legislator had no fixed habitation 'for some period of time' (§ 349, subd. (c)). (*Wright, supra,* 197 Cal.App.4th at p. 515.)

"The word 'residence' should not be considered in a vacuum. In fact, 'the meaning of the word ["residence"] is governed by the purpose and intent of the statute in which it appears or in the context of the circumstances in issue. [Citations.]' (*People v. Horn* (1998) 68 Cal.App.4th 408, 416 [80 Cal.Rptr.2d 310].) In support of Assembly Bill

12

No. 1798 (1983–1984 Reg. Sess.), the bill underlying section 2026, former Assembly Speaker Willie Brown explained to the Governor that the bill was designed to apply to '[l]egislators who, of necessity, spend a great amount of time away from their *true* domicile, often going so far as to purchase homes and move their families to the location of their Legislature in service of their constituents . . . .' (Assembly Speaker Willie Brown, letter to Governor George Deukmejian, Mar. 1, 1984, italics added.) Indeed, we have previously pointed out the purpose of section 2026 is to address and resolve the issue of domicile unique to certain elected officials: 'While many people may choose to have more than one residence, incumbent legislators may be required by their official duties to have two residences, one in Sacramento and one in their home district.' (*People v. Mayer* (2003) 108 Cal.App.4th 403, 419 [133 Cal.Rptr.2d 454].)" (*Wright, supra,* 197 Cal.App.4th at pp. 515-516.)

"The trial court's ruling suggests *any* address listed on the affidavit as [defendant's] residence address would trigger the applicability of the conclusive presumption and, for voting purposes, establish that address as [defendant's] true domicile. This interpretation of 'residence' does not comport with the purpose and intent of section 2026 and would lead to absurd results. What is conclusively presumed is not the legislator's 'residence' but rather his or her 'domicile.' We hold this conclusive presumption applies only if the address indicated on the legislator's currently filed affidavit of voter registration is one of the legislator's legal residences. [Fn. omitted.]" (*Wright, supra*, 197 Cal.App.4th at p. 516.)

Following the issuance of our published opinion, we denied defendant's petition for rehearing. (*Wright, supra,* 197 Cal.App.4th at p. 517.) The Supreme Court thereafter unanimously denied defendant's petition for review. (*Ibid.*)

### 2. *Contentions*

Defendant contends our decision in *Wright, supra,* 197 Cal.App.4th 511 was wrongly decided and urges us to reconsider it. According to defendant, the law of the case doctrine does not apply to bar his challenge to our prior decision because that

13

decision constitutes a manifest misapplication of legal principles that resulted in a substantial injustice—his convictions in this case. Defendant maintains that our decision was wrongly decided because: it violated the separation of powers doctrine by rewriting a valid legislative enactment; it denied his due process rights by depriving him of a fair warning that evidence of his domicile could be used to convict him of the charged crimes and because the language of section 2026 affirmatively misled him into believing that his conduct could not give rise to criminal prosecution; and it violated the rule of lenity by not giving him the benefit of every reasonable doubt when interpreting the statute in issue.

### 3. *Legal Principles*

The law of the case doctrine and the limited exceptions to its application are well established. "As reiterated in *People v. Shuey* (1975) 13 Cal.3d 835, 841 [120 Cal.Rptr. 83, 533 P.2d 211] (*Shuey*): '"The doctrine of the law of the case is this: That where, upon an appeal, the [reviewing] court, in deciding the appeal, states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, and, as here assumed, in any subsequent suit for the same cause of action, and this although in its subsequent consideration this court may be clearly of the opinion that the former decision is erroneous in that particular."' (1) The principle applies to criminal as well as civil matters [citations], and it applies to this court even though the previous appeal was before a Court of Appeal [citation]. [¶] The principal reason for the doctrine is judicial economy. 'Finality is attributed to an initial appellate ruling so as to avoid the further reversal and proceedings on remand that would result if the initial ruling were not adhered to in a later appellate proceeding.' [Citation.] Because the rule is merely one of procedure and does not go to the jurisdiction of the court [citations], the doctrine will not be adhered to where its application will result in an unjust decision, e.g., where there has been a 'manifest misapplication of existing principles resulting in substantial injustice' [citation], or the controlling rules of law have

14

been altered or clarified by a decision intervening between the first and second appellate determinations [citation].  The unjust decision exception does not apply when there is a mere disagreement with the prior appellate determination.  [Citation.]" (*People v. Stanley* (1995) 10 Cal.4th 764, 786-787.)

> ### 4. *Analysis*

In seeking to avoid of the law of the case bar, defendant does not contend that the controlling rules of law have been altered or clarified by an intervening decision.  Instead, he relies exclusively on the unjust decision exception.  But, as the foregoing authorities establish, before a defendant can avail himself of the unjust decision exception, he must demonstrate not just that the decision in question was erroneous, but that it constituted a manifest misapplication of existing legal principles.

Defendant's arguments on appeal do not acknowledge the difference between an appellate decision that may, in retrospect, be erroneous and a decision that so obviously misapplies well established legal principles that it results in a substantial injustice.  In doing so, his arguments amount to nothing more than an untimely request to rehear or reconsider a decision that was rendered almost five years ago.  Reconsideration at this point, however, would run afoul of the principles of finality and judicial economy upon which the law of the case doctrine is based.

Here, defendant had a full and fair opportunity during the prior writ proceeding to brief the issues concerning the proper interpretation and application of the conclusive presumption in section 2026.  Defendant also had a full and fair opportunity to present his views on those issues at oral argument.  And, assuming, arguendo, our subsequent published opinion manifestly misapplied existing legal principles, defendant had a fair opportunity to demonstrate that fact in his petition for rehearing.  Defendant then had yet another fair opportunity to demonstrate that our decision was a manifest misapplication of existing legal principles during the proceedings on his petition for review in the Supreme Court, including the opportunity to present and argue the issues addressed in the amicus letter brief from the Office of Legislative Counsel which set forth Legislative

Counsel's opinions concerning the proper interpretation and application of the conclusive presumption in section 2026. Notwithstanding that amicus letter brief and defendant's arguments in the Supreme Court, his petition for review was denied by a unanimous court.

Since our published opinion became final and binding almost five years ago, it has not been challenged or criticized by any other appellate court and the legislature has not acted to amend or clarify section 2026 to address any asserted manifest misapplication of that section. Given the foregoing procedural history of our decision in *Wright, supra,* 197 Cal.App.4th 511, we are not convinced that it is an erroneous decision, much less a manifest misapplication of existing legal principles, based on all the reasons set forth in our previous opinion. And, even assuming, arguendo, that upon further consideration, we might determine that it is erroneous, that, by itself, would be insufficient to avoid the relitigation bar of the doctrine of law of the case. We therefore conclude that defendant has failed to establish an exception to that doctrine. Absent such an exception, we are prevented under that doctrine from doing what defendant urges us to do, reconsider a final published opinion.

### B.       Entitlement to Invoke Conclusive Presumption

Defendant argues that, even under this Court's interpretation of section 2026, the evidence established, as a matter of law, that the Glenway complex—not unit five (the free-standing house) of that complex which he listed on his voter registration form—was one of his legal residences. In support of that assertion, defendant points to his evidence showing his long-term ownership of the Glenway complex, his prior periodic occupancy of unit six (the garage apartment associated with unit five), and his January 2007 letter agreement with Sanders.

Although defendant couches this issue as purely a matter of law, the issue of residence or domicile is a mixed question of fact and law, and a resolution of it based on conflicting evidence is conclusive in the reviewing court. (*Noble v. Franchise Tax Bd.* (2004) 118 Cal.App.4th 560, 567.) Here, the issue concerning residence was subject to

16

conflicting evidence. Therefore, the issue "is in reality a substantial evidence question," (*Fenton supra*, 156 Cal.App.3d at p. 1117), i.e., was there sufficient evidence that unit five was not one of defendant's legal residences. "When a defendant challenges the sufficiency of the evidence, '"[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence— that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]' [Citations.] . . . 'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. [Citation.]' [Citation.] We ""presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citation.]' [Citation.]" (*People v. Clark* (2011) 52 Cal.4th 856, 942-943.)

Moreover, when a defendant challenges the sufficiency of the evidence as to a particular factual finding, a reviewing court presumes the evidence was sufficient, and the defendant bears the burden of affirmatively demonstrating that the evidence is insufficient. (*People v. Cardenas* (2015) 239 Cal.App.4th 220, 227.) To do so, the defendant must set forth all the material evidence on the issue in the light most favorable to the judgment, not just his own evidence or by portraying the evidence in a light most favorable to him. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881-882; *People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573-1574.) Failure to do so forfeits the contention on appeal. (*Ibid.*)

Because it appeared that defendant's factual statement on appeal did not set forth all the material evidence regarding the jury's finding that unit five at the Glenway complex was not one of his legal residences, we asked the parties to submit letter briefs on whether defendant forfeited his challenge to the sufficiency of the evidence in support

17

of that finding. In his letter brief on the forfeiture issue, [6] defendant contends that his factual statement in his opening brief discusses all the evidence relevant to his contention that he was entitled to the conclusive presumption in section 2026. According to defendant, the sole issue concerning the conclusive presumption is whether his evidence showed that he had a fixed period of habitation at *any* of the six units at the Glenway complex at *any* time since he acquired it in 1977. Defendant concludes that because he testified he lived in unit six for a year and one-half after acquiring the complex, and thereafter occupied that unit for several months at a time on four or five other occasions prior to 1988, he established the *entire* Glenway complex as his legal residence and the prosecution provided no evidence to the contrary.

Defendant's argument is based on a misreading of California law and on a faulty factual premise which ignores that he listed *unit five* of the complex on his voter registration form, not the entire complex or unit six. It further ignores that the indictment accused him of falsely listing *unit five* as his residence on his voter registration form and the jury instruction on count one—perjury by declaration—advised the jury that the false statement on which defendant was being prosecuted in count one was his statement under oath that he lived in *unit five*. In addition, defendant's argument fails to acknowledge the prosecution's entire case was predicated on the theory that defendant resided at the Don Milagro residence, when he was not living at his apartment in Sacramento while serving as a State Senator, and that he had no fixed period of habitation at unit five of the

---

[6]    In his letter brief, defendant claims the argument was not waived. Our Supreme Court has explained that, under these circumstances, the principle is forfeiture, not "waiver." "As the United States Supreme Court has clarified, the correct term is 'forfeiture' rather than 'waiver,' because the former term refers to a failure to object or to invoke a right, whereas the latter term conveys an express relinquishment of a right or privilege. (See, e.g., *United States v. Olano* (1993) 507 U.S. 725, 733 [113 S.Ct. 1770, 123 L.Ed.2d 508]; *In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. 2 [13 Cal.Rptr.3d 786, 90 P.3d 746] (*S.B.*); *People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9 [108 Cal.Rptr.2d 385, 25 P.3d 598] (*Simon*).) As a practical matter, the two terms on occasion have been used interchangeably. (*Simon*, at p. 1097, fn. 9; *People v. Saunders* (1993) 5 Cal.4th 580, 590, fn. 6 [20 Cal.Rptr.2d 638, 853 P.2d 1093] (*Saunders*).)" (*In re Sheena K.* (2007) 40 Cal.4th 875, 880, fn.1.)

Glenway complex. Those were the only two properties that were searched during the investigation and only the contents of those two properties were inventoried, photographed, video recorded, and presented to the jury in support of the prosecution's theory of the case. Moreover, only residents of the Glenway complex and neighbors on Don Milagro Drive were interviewed and called to testify at trial in support of the prosecution's theory.

Nevertheless, defendant's opening brief ignores most, if not all, of the prosecution's evidence because, according to defendant, it was irrelevant to *his* flawed theory of the case. In support of that assertion, defendant cites to *Fenton, supra*, 156 Cal.App.3d 1107 and *Collier v. Menzel* (1985) 176 Cal.App.3d 24 (*Collier*) and, based solely on those cases, concludes in his letter brief that "[u]nder California law, a home that one owns but where one has not lived for many years may be a legal residence if one's habitation was fixed there at some time in the past." Neither case cited, however, stands for such a broad proposition.

In *Fenton, supra*, 156 Cal.App.3d 1107, the plaintiff presented evidence on a domicile issue showing that she had lived at her property on Big Oak Road for 20 years, after which she purchased and lived part-time at a property in Ferndale. Several years later, the plaintiff began to live exclusively at the Ferndale property for a period of approximately 13 years, during which time she regularly visited and maintained the Big Oak property because she considered that property to be her "home." (*Id*. at pp. 1111-1112.) Based on the plaintiff's evidence, the court in *Fenton* concluded that substantial evidence supported the trial court's finding that the Big Oak property was the plaintiff's domicile for purposes of the Government Code section in issue, which required the plaintiff be domiciled in the district of the local agency board to which she had been appointed. (*Id*. at p.1117-1118.)

The decision in *Fenton, supra*, 156 Cal.App.3d 1107 was based on facts that are unrelated to the evidence at issue in this case. Defendant did not contend, much less present evidence, he had resided in unit five continuously for 20 years or that, once he left that unit, he regularly visited it and still considered it to be his "home." Moreover,

the issue in that case concerned the sufficiency of the evidence of domicile, not legal residence under sections 349 and 2026. The court in *Fenton* did not state or imply that a fixed period of habitation in one unit of a multi-unit apartment complex, many years before a voter registered to vote in that property's district, would establish *another* unit at the complex as the voter's residence for purposes of sections 349 and 2026.

The facts in *Collier, supra*, 176 Cal.App.3d 24 are also readily distinguishable from this case. There, three homeless persons who were living in a park in Santa Barbara listed the address of the park on their voter registration forms as their residence. (*Id*. at pp. 29-30.) The court in *Collier* merely held that, so long as the homeless voters were *actually residing* in the park, they could register to vote in the precinct in which the park was located. (*Id*. at pp. 30-32.) Because the holding in *Collier* dealt solely with the issue of *current* residency, it provides no support for defendant's contention based on a past period of fixed habitation in a different unit of the complex than the one listed on his voter registration form.

As our prior opinion in this case explained, the purpose of the exclusive presumption in section 2026 was to address the issue of a legislator's domicile for voting purposes when the legislator had two *current* legal residences—one in his home district and one in Sacramento that he or she used while the Legislature was in session. At trial in this case, there was substantial evidence presented to support a finding that defendant was not currently residing in any unit at the Glenway complex, including unit five, and that instead his second current residence, when he was not residing in Sacramento, was the Don Milagro residence. Defendant's failure to acknowledge, much less discuss candidly, that evidence in his opening brief therefore forfeited his contention that there was insufficient evidence to support the jury's finding that unit five of the Glenway complex was not one of his legal residences for purposes of the conclusive presumption of domicile in section 2026.

20

## C.       Instructional Error on Count 1

### 1.       *Contention*

Defendant contends the trial court erred by refusing to instruct the jury as to count one that the phrase "address where you live" on his voter registration form referred to his domicile for voting purposes.  According to defendant, the trial court had a sua sponte duty to give a clarifying instruction on the domicile issue because the voter registration form's use of the term "live" had the potential to confuse the jury, particularly in light of the court's other instruction that "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings."  Defendant maintains that without the clarifying instruction, the jury was unable to properly adjudicate the intent element of the count one perjury charge because the use of the term live in the instruction likely caused the jury to adjudicate whether defendant intended to lie about where he lived, not about where he was domiciled.

### 2.       *Background*

As explained above, defendant was charged in count one with perjury because, on his voter registration form, he declared under penalty of perjury that the address where he lived was unit five of the Glenway complex.  During a jury instruction conference concerning the materiality element in CALCRIM No. 2640, defendant's counsel suggested that because voter eligibility depended on a person's domicile, rather than the place a person lives, the trial court should instruct the jury that the word "lived" as used in the instruction was immaterial if defendant satisfied the domicile requirement.  The trial court responded by proposing that the jury be advised that "information is material if it goes directly to the person's qualifications to register to vote in that district."  Defendant's counsel agreed to the trial court's proposal,  saying, "That's fine."

The trial court thereafter instructed the jury on count one using CALCRIM No. 2640.  The trial court's instruction stated, in pertinent part:  "The defendant is charged in

21

Count One . . . with perjury in violation of Penal Code section 118. [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant declared, or certified under penalty of perjury under circumstances in which such declaration, or certificate was permitted by law; [¶] 2. When the defendant declared, or certified, he willfully stated that the information was true even though he knew it was false; [¶] 3. *The information was material*; [¶] 4. The defendant knew he was making the statement under penalty of perjury; AND [¶] 5. When the defendant made the false statement, he intended to declare or certify falsely while under penalty of perjury; AND [¶] 6. The defendant signed and delivered his declaration, or certificate to someone else intending that it be circulated or published as true. [¶] Someone commits an act willfully when he or she does it willingly or on purpose. [¶] *Information is material if it goes directly to the person's qualifications to register to vote in that district as to Count One.* [¶] . . . [¶] The People allege that the defendant made the following false statements: as to count One: that he lived at 868 Glenway Drive #5, Inglewood; . . . ." (Italics added.)

During jury deliberations, defendant objected to the use of the term "lives" on the jury verdict form instead of the term "domicile."[7] The trial court overruled the objection because the voter registration form used the term "lived." After trial, defendant filed a motion for new trial in which he argued, inter alia, that the trial court misinstructed the jury on count one by using the term "lived" as opposed to domicile. The trial court heard and denied the motion.

### 3. *Legal Principles*

---

[7] The jury verdict form on count one provided: "We, the Jury in the above-entitled action, find [defendant], GUILTY of the crime of PERJURY BY DECLARATION, on or about March 14, 2007, in the County of Los Angeles, the defendant did unlawfully, under penalty of perjury, declare as true, a material fact that he knew at the time to be false, to wit, in his Voter Registration Form, declared that the address where he lives is 868 Glenway Drive, #5, Inglewood, in violation of Penal Code Section 118(a), a Felony, as charged in Count 1 of the Indictment."

"In a criminal case, a trial court has a duty to instruct the jury on """"the general principles of law relevant to the issues raised by the evidence.""""" [Citations.] The 'general principles of law governing the case' are those principles connected with the evidence and which are necessary for the jury's understanding of the case. [Citations.] As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' [Citation.] [¶] . . . [¶] "When a word or phrase '"is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request."'" [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that *differs* from its nonlegal meaning. [Citation.] . . . Thus, as the court in *People v. Richie* (1994) 28 Cal.App.4th 1347 [34 Cal.Rptr.2d 200] explains, terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance. [Citation.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574-575.)

"'[T]he case law is clear that whether the giving of a concrete instruction is confusing or erroneous must be determined from the instructions as a whole. . . . "Error cannot be predicated upon an isolated phrase, sentence or excerpt from the instructions since the correctness of an instruction is to be determined in its relation to other instructions and in the light of the instructions as a whole. [Citations.] Accordingly, whether a jury has been correctly instructed is not to be determined from a part of an instruction or one particular instruction, but from the entire charge of the court."' [Citation.]" (*People v. Gomez* (1986) 183 Cal.App.3d 986, 992.) "As jurors are presumed to follow the instructions given by the court (*People v. Murtishaw* (1989) 48 Cal.3d 1001, 1044 [258 Cal.Rptr. 821, 773 P.2d 172]), we presume they did so." (*People v. McDonald* (2015) 238 Cal.App.4th 16, 26.) In evaluating the impact of an instruction on the jury, the reviewing court considers the arguments of counsel. (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

### 4. Analysis

In giving CALCRIM No. 2640 on count one, the trial court informed the jury that the prosecution alleged defendant made a false statement—"he lived at 868 Glenway Drive, number five, Inglewood . . . ." But the trial court also informed the jury as to count one that the false statement must be material and explained that "[i]nformation is material if it goes directly to a person's qualifications to register to vote in that district . . . ."

Subsequent instructions explained that to be qualified to vote in a district, a person was required to be domiciled there. For example, the instruction based on section 321 explained that an "elector" must be a "resident of an election precinct at least 15 days prior to an election." The next instruction, based on section 349, made clear that "'[r]esidence' for voting purposes means a person's domicile" and it defined domicile as "that place in which his or her habitation is fixed, wherein the person has the intention of remaining, and to which, whenever he or she is absent, the person has the intention of returning." The instruction based on section 2021 also explained that a person could leave his or her domicile to go into another state or precinct temporarily, but with the intention to return, and not lose his or her domicile.

Thus, the trial court's instructions when read together clearly informed the jury that to be guilty on count one, defendant must have intended to lie about his domicile on his voter registration form. Moreover, both the prosecutor and defense counsel emphasized during their respective arguments that the perjury charge in count one was based on defendant's act of listing unit five as his domicile or voting address. And, the jury did not have any questions concerning the instruction. Thus, notwithstanding the use of the term "lived" in the instruction, it was not reasonably likely that the jury misunderstood the instruction as claimed by defendant. In light of the totality of the instructions, we hold the trial court committed no error.

25

### D.    Prosecutorial Misconduct During Argument

Defendant contends that the prosecutor engaged in prejudicial misconduct during argument by misstating the law applicable to the domicile issue.  According to defendant, the prosecutor misinformed the jurors that they could convict defendant on counts two through eight for not living at unit five of the Glenway complex, instead of informing them that defendant could only be convicted on those counts if they found that unit was not defendant's domicile.

"'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'"  [Citations.]  Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a fundamentally unfair trial.  [Citation.]  In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.'  [Citations.]" (*People v. Thompson* (2010) 49 Cal.4th 79, 120-121.)

The Attorney General contends defendant forfeited this claim because, when the prosecutor made the comments at issue, defendant failed to object and request a curative instruction.  In response, defendant concedes he did not make the necessary objections during argument, but maintains an objection would have been futile because the trial court rejected similar positions he had taken (1) in his pretrial motion to dismiss, (2) when proposing jury instructions, (3) during the discussions on the element of materiality, and (4) when he objected post-argument (during jury deliberations) to the use of the word "lives" in the verdict form.

But defendant wholly fails to explain how an argument made in a pretrial motion years before trial can excuse him from the duty to object during argument.  Similarly, while defendant refers to his proposed jury instructions, he does not specify which instruction or instructions raised the issue, much less explain whether or why the trial

26

court rejected those instructions. In addition, defendant fails to explain how a suggestion that his counsel made to the trial court, prior to argument, concerning the wording of a jury instruction on materiality, could excuse his failure to object during argument. And, of course, defendant fails to explain how an objection to a verdict form made *after* the prosecutor had concluded his arguments could possibly operate to excuse him from his failure to make any objection to the alleged misstatements *during* argument.

In addition, it is quite clear that, even if the prosecutor's remarks were somehow unfair (which we do not suggest they were), an admonition to the jury could have readily cured any undue prejudice to the defense. The comments were neither inflammatory nor irrational. Indeed, it is common for a person to respond to a question of where they "live" by providing a location that is their domicile rather than a place of transitory housing. In this respect, it is entirely reasonable to conclude that, if defendant had objected, the trial court would have simply told the jury that the prosecutor's argument was not evidence and that the elements of the crime were defined by the jury instructions which, as we pointed out previously, were accurate. Such an admonition would have been an effective tool to allay defendant's perceived harm.

The arguments of prosecutorial misconduct are forfeited.


### E.  Substantial Evidence of Criminal Intent

Defendant contends there was insufficient evidence to support the jury's finding that he acted with the requisite intent to commit the crimes charged in counts one, two, and four through eight. But, as discussed above in connection with the jury's finding on the residency issue, his factual statement did not appear to set forth all the material evidence relevant to the intent finding. (*Foreman & Clark Corp. v. Fallon, supra,* 3 Cal.3d at pp. 881-882; *People v. Sanghera, supra*, 139 Cal.App.4th at pp. 1573-1574.) We therefore asked the parties to brief the forfeiture issue.

In his letter brief, defendant contends he did not omit any material evidence relevant to the intent element, even though he admittedly failed to discuss the vast majority of the prosecution's evidence and exhibits. According to defendant, most if not

all of the prosecution's evidence dealt with the issue of whether he lived at the Don Milagro residence, as opposed to unit five of the Glenway complex, and that evidence was irrelevant to the issue of whether he intended to lie about the address of his domicile on his voter registration form.

Contrary to defendant's assertion, the prosecution's evidence was relevant to intent. It strongly suggested he had a fixed period of habitation at the Don Milagro residence; he intended to remain at that location; and, when absent, he intended to return to the Don Milagro residence. By contrast, the prosecution's evidence showed defendant had no fixed period of habitation at unit five of the Glenway complex and it was, at most, a transitory step for him. Because a defendant's intent can be inferred from his actions (*People v. Imler* (1992) 9 Cal.App.4th 1178, 1182 ["The defendant's intent may be inferred from his conduct . . ."]), the prosecution's evidence provided the jury with a basis to infer defendant knew he was domiciled at the Don Milagro residence and had no fixed period of habitation at unit five or any intent to remain at, or return to, that unit. Therefore, his act of listing unit five of the Glenway complex on his voter registration form despite that knowledge supported an inference that he intentionally misrepresented his domicile for purposes of voting. Defendant's failure to candidly address the prosecution's evidence in the context of the intent element therefore forfeited his sufficiency claim on appeal.

## F.      Accuracy of Declaration of Candidacy

Defendant contends his convictions on counts 2 and 3 must be reversed because they are based on his declaration of candidacy which stated under oath that he satisfied the residency requirements to run for State Senator in the 25th District. According to defendant, because the California Constitution's one-year residency requirement (Cal. Const., art. IV, § 2, subd. (c)) has been declared unconstitutional by the Secretary of State and the Attorney General, his declaration of candidacy was true and immaterial.

Contrary to defendant's assertion, the one-year residency requirement in article IV, section 2, subdivision (c) of the California Constitution has never been declared

unconstitutional. Although the Secretary of State in 1976 rendered an "opinion" that the one-year requirement was unconstitutional, the Attorney General did not state or imply agreement with that opinion. Instead, based on an inquiry from the Secretary of State about the constitutionality of the one-year residency requirement, the Attorney General opined that the Secretary of State had no authority to enforce that requirement and declined to reach the constitutional issue posed by the Secretary of State. (62 Ops.Cal.Atty.Gen. 365, 369 (1979) ["It is concluded that the Secretary of State is not authorized to enforce the provision of article IV, section 2, subdivision (c) of the California Constitution imposing a one year residence prerequisite for membership in the Legislature"].) In doing so, the Attorney General distinguished those cases that declared durational residency requirements for local public office unconstitutional—including *Johnson v. Hamilton* (1975) 15 Cal.3d 461—and reaffirmed that no appellate court had declared the one-year residency requirement for statewide office unconstitutional. (62 Ops.Cal.Atty.Gen. 365, 366-367 ["All of the above-cited cases concerned elections for local public office. The durational residence requirement for statewide office set forth in section 2 of article IV of the California Constitution has never been determined by an appellate court to be unconstitutional. (*Cf. Johnson v. Hamilton, supra,* 15 Cal.3d at 471-472.)"].)

Given that the authorities upon which defendant relies for this contention do not support it, we conclude that, at the time defendant executed under penalty of perjury his declaration of candidacy, there was an enforceable residency requirement for the statewide office in the California Constitution. No appellate court had ever held the one-year residency requirement for statewide, as opposed to local, office to be unconstitutional.[8] Therefore, defendant's statement in his candidacy declaration—that he

---

[8] Although defendant now contends that the one-year residency requirement was unconstitutional, he proposed a jury instruction which expressly stated that under the California Constitution, one of the requirements for election to a statewide office is that the candidate must be "a resident of the legislative district for one year . . . ."

29

met all the legal requirements for that office—was both false and material, and it fully supported his convictions on counts 2 and 3.

## DISPOSITION

The judgment of conviction is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

KUMAR, J.*

We concur:

TURNER, P. J.

KRIEGLER, J.

---

*    Judge of the Superior Court of the County of Los Angeles, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

30