TO BE PUBLISHED IN THE OFFICIAL REPORTS

OFFICE OF THE ATTORNEY GENERAL
State of California

XAVIER BECERRA
Attorney General

_____

|  |  |  |
|---|---|---|
| OPINION | : | No. 17-601 |
| of | : | April 11, 2018 |
| XAVIER BECERRA<br>Attorney General | : | |
| CATHERINE BIDART<br>Deputy Attorney General | : | |

_____

Proposed relator, the CITY OF DIXON, applies to this office for leave to sue proposed defendant DEVON MINNEMA, Dixon city council member from the city's District 4, in quo warranto to oust him from that office on the ground that he did not reside in District 4 at all times required by state law.

CONCLUSION

Proposed relator does not raise a substantial question of law or fact that warrants initiating a judicial proceeding, and allowing the proposed quo warranto action to proceed would not serve the public interest. Proposed relator's application for leave to sue in quo warranto is therefore DENIED.

ANALYSIS

Proposed relator the City of Dixon (City) is a general law city with a city manager form of government.[1]  As such, eligibility to be a council member requires continuous residence in the represented City district from the time nomination papers[2] are issued.[3] Here, the City requests leave to sue proposed defendant Devon Minnema (Minnema) in quo warranto[4] under Code of Civil Procedure section 803 to challenge his right to hold the office of city council member from the City's District 4.

Specifically, the City alleges that Minnema is ineligible to hold office because he did not reside in District 4 on August 2, 2016, the date on which he obtained his nomination papers, and also questions his residence in District 4 from that date and continuing through his election to the council in November 2016.  For the reasons discussed below, we find that the City's allegations do not raise a substantial legal or factual issue that would warrant the initiation of a quo warranto lawsuit.

**Quo warranto**

A party granted leave to sue from the Attorney General may bring a lawsuit in the name of the People of the State of California "against any person who usurps, intrudes into, or unlawfully holds or exercises any public office . . . ."[5]  In considering whether to

---

[1] See Gov. Code, § 34851 (authorizing city manager form of government).

[2] See Elec. Code, §§ 10220 (setting forth process for nominating candidates by voters' signing nomination papers) & 10227 (prescribing process for issuing nomination papers for signature).

[3] Gov. Code, § 34882; 83 Ops.Cal.Atty.Gen. 181, 183 (2000) (proposed defendant ineligible to retain office if he or she resided outside of district when elected); 79 Ops.Cal.Atty.Gen. 243, 245 (1996) ("in the absence of statutory expression to the contrary, a residence requirement for election remains as a condition to the continued right to hold office"), quoting 75 Ops.Cal.Atty.Gen. 26, 28 (1992).

[4] Latin for "by what authority," quo warranto was originally a writ used by English monarchs to challenge a royal subject's claim to an office or franchise supposedly granted by the Crown.  (California Attorney General's Office, Quo Warranto (1990), p. 1, available at https://oag.ca.gov/sites/all/files/agweb/pdfs/ag_opinions/quo-warranto-guidelines.pdf [as of March 29, 2018].)  Quo warranto has evolved into a statutory proceeding to determine, among other things, whether a person is entitled to hold a particular public office. (*Id*. at p. 3.)

[5] Code Civ. Proc., § 803.  The statute also authorizes the Attorney General to bring

2

grant leave to sue, we must determine whether (1) there is a substantial issue of fact or law warranting a judicial resolution, and (2) allowing the proposed quo warranto action to proceed would serve the overall public interest.[6]  Our analysis is guided by the principle that a "chief object in requiring leave is to prevent vexatious prosecutions, and the rule is inflexible that there must be affidavits so full and positive from persons knowing the facts as to make out a clear case of right in such a way that perjury may be brought if any material allegation is false."[7]

### Applicable law concerning "legal residence" or "domicile"

In this context, the residence of a public official or candidate for public office means his or her *legal* residence, also referred to as domicile[8]—which is in turn defined as a person's fixed habitation where he or she intends to remain, and intends to return to whenever absent.[9]  While a person may have multiple residences, a person may have one domicile only at any given time.[10]  Thus, a domicile "cannot be lost until another is gained."[11]  To change domicile, it requires a "union of act and intent."[12]

Because a determination of domicile is based not only on physical conduct, but also intent, the requirement that a substantial showing be made before we authorize judicial resolution is particularly pertinent.[13]  The determination of domicile is a mixed question of fact and law which may involve many factors, such as acts and declarations

---

such a suit directly.

[6] 87 Ops.Cal.Atty.Gen. 30, 31 (2004) (explaining that we make no final judgment on the merits but "a substantial showing must be made before we will authorize a judicial challenge to a person's right to hold public office"); 83 Ops.Cal.Atty.Gen., *supra*, at p. 182 (2000).

[7] 8 Ops.Cal.Atty.Gen. 221, 222 (1946), quoting *Lamb v. Webb* (1907) 151 Cal. 451, 456.

[8] *Walters v. Weed* (1988) 45 Cal.3d 1, 7; 72 Ops.Cal.Atty.Gen. 8, 11 (1989).

[9] Elec. Code, § 349, subd. (b); Gov. Code, § 244, subd. (a) ("It is the place where one remains when not called elsewhere for labor or other special or temporary purpose, and to which he or she returns in seasons of repose").

[10] Elec. Code, § 349, subd. (b); Gov. Code, § 244, subd. (b).

[11] Gov. Code, § 244, subd. (c).

[12] Gov. Code, § 244, subd. (f).

[13] 87 Ops.Cal.Atty.Gen., *supra*, at p. 31.

by the official, his or her mailing address, voter registration, car registration, tax returns, and where a homeowner's or renter's credit is taken, but the critical element is intent.[14]

**The parties' contentions and our analysis of the evidence**

Minnema resided outside of the City's District 4 before July 27, 2016. Prior to that date, Minnema, at 21 years of age, resided in the City's District 3, with roommates, in his mother and stepfather's home, while they lived in Texas for fourteen months. On July 26, 2016, Minnema learned from the District 3 incumbent council member that the member would seek reelection that fall; upon learning of this, Minnema stated that he would move to District 4, so as not to run against the District 3 incumbent. The parties do not dispute these preliminary facts. What is disputed, however, is the question where Minnema resided when he obtained his nomination papers on August 2, 2016, through his election a few months later.

On the one hand, Minnema has stated under penalty of perjury that he moved to District 4 on July 27, 2016, and has resided in District 4 ever since. Specifically, he states that he moved on that date to 1320 Revelle Court, and then on September 19, 2016, to 1205 Valley Glen, both of which are locations within District 4.[15]

On the other hand, the City alleges in its application for quo warranto that Minnema did not reside in District 4 from the time he obtained his nomination papers through his election. In response to doubts expressed to the City about Minnema's residence, the City hired an investigator to look into the matter, and its allegations here are largely based upon its investigator's report.

As to the Revelle Court address, the City relies on unsworn statements made by neighbors to its investigator that they did not see Minnema or his vehicle there (although the investigator's report also indicates at least one neighbor occasionally saw Minnema and his vehicle there during the relevant period), and a sworn affidavit from Revelle

---

[14] See, e.g., 99 Ops.Cal.Atty.Gen. 74, 76–77 (2016); 85 Ops.Cal.Atty.Gen. 90, 93 (2002); 73 Ops.Cal.Atty.Gen. 197, 209–210 (1990); 72 Ops.Cal.Atty.Gen. 15, 22 (1989); 72 Ops.Cal.Atty.Gen., *supra*, at p. 14. As discussed below, we have been presented with evidence that includes Minnema's declaration (specifically, an affidavit of residence), mailing address, voter registration, and other items, such as affidavits by witnesses and copies of rental receipts.

[15] Although outside the time period raised in the City's application for leave to sue, Minnema also states that he moved to 1115 Bello Drive, which is also in District 4, on May 15, 2017.

4

Court neighbor Fermin Rubio, who stated he did not observe Minnema living on Revelle Court but was "confident" that he would have if that had been the case. The City further disputes Minnema's Revelle Court residency because it was temporary, because Minnema was still seen at his mother and stepfather's home in District 3 during this time period, and because Minnema's former roommates at the District 3 home told the investigator that Minnema moved from there to the Valley Glen address without mentioning the intervening Revelle Court address. The City also alleges that Minnema produced no physical evidence of his presence at Revelle Court and rebuffed its requests for an affidavit of residence.

As to the 1205 Valley Glen address, the City disputes Minnema's residence at this location in large part because he claims to have resided in its garage, which lacks a bathroom.[16] The City also alleges that Minnema and his mother contacted a property manager during the relevant period, urgently seeking housing for Minnema in District 4. The City's investigator, however, found that Minnema initially resided at 1205 Valley Glen on a periodic basis, but concluded that the timing of his move there was unclear due to contrasting witness statements, the lapse of time, and the lack of a traditional lease. The investigator also generally concluded it was likely that Minnema stayed the night at multiple residences after his conversation with the District 3 incumbent.

In his sworn response to the City's application for quo warranto, Minnema maintains that on July 27, 2016, the day after learning that the District 3 incumbent would seek reelection, he began formally residing at 1320 Revelle Court, where his aunt and uncle live, in District 4, and moved numerous boxes of his belongings there. Minnema also maintains that on September 15, 2016, he moved to 1205 Valley Glen, owned by his friend's mother, from whom he rented the garage space, while continuing to look for more suitable housing.

With his response, Minnema provided his signed affidavit of residence in District 4 that the City had previously requested. He also provided a copy of a post office confirmation dated August 2, 2016, showing his address change to 1320 Revelle Court, and his voter registration and nomination papers—both processed on August 2, 2016, and signed under penalty of perjury—which list his address as 1320 Revelle Court. Minnema updated his voter registration on September 19, 2016, to show his address as 1205 Valley Glen.

---

[16] Neither party otherwise addresses the potential legal implications—for example, building and safety violations—of such a living arrangement, and we see no need to do so to determine the issue before us.

5

In addition to his affidavit, change-of-address confirmation, voter registration, and nomination papers, Minnema also provided sworn affidavits by his uncle, mother, stepfather, and former roommates, as well as copies of rental receipts, text messages with his aunt, and communications with friends and potential landlords documenting his search for housing in District 4.

The affidavit from Minnema's uncle, signed October 4, 2016, states that Minnema resided at 1320 Revelle Court since June 1 of that year. No affidavit by Minnema's aunt was provided, but a copy of Minnema's text messages with her corroborate his arrangements to stay at the Revelle Court house in a fully-furnished bedroom.[17] Because Minnema asserts that he resided on Revelle Court for only about a month and a half, until other accommodations could be found, we would not expect much physical evidence to exist of his residence there. But in addition to his uncle's affidavit and text messages with his aunt, Minnema also provided a copy of a bill in his name sent to him at the Revelle Court address during the relevant period. He also provided a copy of a picture of him, dated August 15, 2016, with his aunt and uncle's pets whom he helped take care of during one of the weeks he was there while his aunt and uncle were in Hawaii. And the City investigator's report includes a copy of Minnema's public Facebook post, dated August 2, 2016, in which he replies "Revelle Court" to a question of where he lives.

As to the City's allegation that he was still seen at the home of his mother and stepfather in District 3 after July 27, 2016, Minnema attributes this to his property-management duties at that address while his mother and stepfather were away in Texas until they returned in September of 2016. With regard to his former roommates' statements to the City's investigator that Minnema moved from the District 3 address to "Valley Glen" (without mentioning the intervening Revelle Court address), the roommates explain under oath that they were not referring to the specific address of 1205 Valley Glen, but to the Valley Glen subdivision in which Revelle Court is located.

We next turn to the affidavit from Minnema's father. He attests that, on July 27, 2016, the day after Minnema confirmed that the District 3 incumbent was running for reelection, he helped Minnema move several boxes and a bookshelf to 1320 Revelle Court, and then on September 15, helped him move those items and a box spring and mattress to 1205 Valley Glen. The affidavit states that on both occasions, they used Minnema's father's pickup truck, due to problems with Minnema's and his mother's

_____

[17] We note that, as the City points out, there is a discrepancy in dates between Minnema's uncle's affidavit and his own: His uncle states that Minnema resided at 1320 Revelle Court since June 1, while Minnema states he resided there from July 27 through mid-September of 2016. To address the discrepancy, Minnema explains that he began formally residing there on July 27, but first made the arrangements back in June.

vehicles.  The affidavit also states that, during the week of September 1, 2016, Minnema left his vehicle at his father's residence (which is located outside of District 4) while Minnema visited his mother and stepfather in Texas, accounting for the vehicle's absence from Revelle Court for one of the weeks he resided there.[18]

Minnema's mother and stepfather also attest that, near the end of September, they helped Minnema move the rest of his belongings to the 1205 Valley Glen garage space, and witnessed on multiple occasions his messy living space there.  An affidavit from a resident of the room above the garage at 1205 Valley Glen attests that Minnema moved into the garage space in September.  Minnema also provided copies of text messages arranging to rent that space, along with rental receipts that cover the period between mid-September of 2016 through mid-May of 2017.  And, according to the City's own investigation, a few neighbors corroborated seeing Minnema's vehicle nearby, as did the property owner and her son (both of whom lived there).

As to Minnema's refusal to voluntarily comply with the City's requests for a signed affidavit of residence, we believe that his refusal to the City has little significance because he provided it with his response, along with his sworn statements of residence on his nomination papers and voter registration.[19]

Finally, we address the City's argument that, notwithstanding the issue of Minnema's physical presence at his claimed residences, Minnema lacked the intent to permanently reside in District 4 so as to establish his domicile there.  Specifically, the City asserts that Minnema's alleged residences were temporary, not permanent, and that he sought to establish residence in District 4 solely to run for office.  Minnema maintains that he intended his move to District 4 be permanent, and points to his previous ties to the district, including his attendance at public schools and church, and his service on a downtown association, within the district.  In our view, Minnema's documented communications of his search for housing in the district during the relevant period support his sworn stated intent to remain there.[20]

---

[18] Minnema's travel to Texas during the week of September 1, 2016, is corroborated by affidavits by Minnema's mother and stepfather, as well as a copy of Minnema's flight itinerary.  As he was away for one week of the short period he allegedly resided on Revelle Court, it would be unsurprising for neighbors not to have seen him there (although the investigator's report indicated at least one had done so).

[19] See 73 Ops.Cal.Atty.Gen., *supra*, at pp. 197, 199 (official permitted to challenge entity's ouster of official for allegedly not residing in district, despite the fact that official had not provided affidavit of residence to ousting entity that had requested it).

[20] Likewise, the City's allegation that Minnema and his mother contacted a property

In any event, the City's challenge to Minnema's intent is misplaced.  Even though Minnema's living space at the Valley Glen address was a garage, a domicile need not be a traditional place of residence, so long as it is a place of fixed habitation.[21]  And there is no requirement for an intent to permanently remain at a particular *dwelling*; instead, what matters is the intent to permanently remain in the *district*.[22]  It is of no consequence that Minnema sought residence in District 4 to run for office, and made temporary moves within the district while establishing a domicile there:  Moving to an electoral district in order to run for office in that district does not defeat the intent for domicile, nor do temporary moves within the district.[23]  Again, it is the intent to remain within the district that matters.[24]  We believe that Minnema's actions, which "speak louder than words,"[25] are consistent with and reflect his stated intent, and that the City has presented insufficient evidence to cast doubt upon that intent.

After carefully considering all of the evidence presented, we find that no substantial showing has been made that would warrant the initiation of a quo warranto action on the question of Minnema's residency.[26]  In sum, the City's challenge is based on scant, ambiguous, circumstantial, and largely unsworn evidence—as opposed to the direct, sworn statements of action and intent (and supporting documentation) that Minnema has provided.  In general, "ambiguities concerning the right to hold public

---

manager during the relevant period, urgently seeking housing for Minnema in District 4, is consistent with his stated desire to find more suitable housing and supports the element of intent to remain in the district.

[21] See *Collier v. Menzel* (1985) 176 Cal.App.3d 24, 31 (finding that public park, while not legally designated as a place for camping, can qualify as the place of fixed habitation for domicile, because it is a physical area where a person can sleep and otherwise use as a dwelling place).

[22] *DeMiglio v. Mashore* (1992) 4 Cal.App.4th 1260, 1269–1270 (explaining that permanency and intention to remain "have nothing to do with the actual dwelling," and a person "could be domiciled in one town all his or her life and have many residences, some obviously temporary").

[23] *Id*. at pp. 1267, 1269–1270.

[24] See *ibid*.

[25] See 85 Ops.Cal.Atty.Gen., *supra*, at p. 93, quoting *Estate of Lagersen* (1959) 169 Cal.App.2d 359, 366.

[26] See 72 Ops.Cal.Atty.Gen. 63, 69 (1989) (our role is to determine whether there is a fact or question of law that should be determined by a court).

office should be resolved in favor of eligibility."[27] We recognize that the parties offer competing scenarios here, but we have broad discretion in ruling on quo warranto applications, and the presence of an arguable or debatable issue does not necessarily establish that the issue is a substantial one, much less that the dispute warrants judicial resolution in a quo warranto action.[28] In light of the evidence presented to us, we perceive no substantial question of law or fact that would warrant a judicial examination of the issue whether Minnema was domiciled in District 4.[29] And, given our analysis, we

[27] 72 Ops.Cal.Atty.Gen., *supra*, at p. 23, citing *Helena Rubenstein Internat. v. Younger* (1977) 71 Cal.App.3d 406, 418.

[28] See *Rando v. Harris* (2014) 228 Cal.App.4th 868, 880-882 (relator's arguable interpretation of City Charter provision did not automatically elevate claim into a substantial question of law or fact for purposes of determining the appropriateness of quo warranto, let alone demonstrate an "extreme and indefensible abuse of discretion" in denying application); 96 Ops.Cal.Atty.Gen. 48, 49 (2013); see also *City of Campbell v. Mosk* (1961) 197 Cal.App.2d 640, 650 ("We do not believe . . . that the debatable issue inevitably produces the quo warranto. Indeed, the Attorney General's exercise of discretion is posited upon the existence of a debatable issue. . . . The crystallization of an issue thus does not preclude an exercise of his discretion; it causes it. . . . The exercise of the discretion of the Attorney General in the grant of such approval to sue calls for care and delicacy. Certainly the private party's right to it cannot be absolute; the public interest prevails").

[29] At most, the City's allegations might support a finding that Minnema had multiple residences, which are permissible. (See *Fenton v. Bd. of Directors of the Groveland Community Services Dist.* (1984) 156 Cal.App.3d 1107, 1114; *Lowe v. Ruhlman* (1945) 67 Cal.App.2d 828, 833 ["It is elementary that a person may have a residence separate from his domicile"]; 75 Ops.Cal.Atty.Gen. 287, 289 (1992) (finding it is "not probatively significant" that proposed defendant "has purchased or moved to a residence outside the district, since an individual may well have multiple residences as that term is commonly understood and as distinguished from the concept of domicile.") Where facts indicate a person has two residences, the question of which one is the legal residence is a matter of intent. (*Sherman v. Reynolds* (1927) 83 Cal.App. 403, 406–07; *Chambers v. Hathaway* (1921) 187 Cal. 104, 106.) As we have explained, we do not believe the City has presented sufficient evidence to cast doubt on Minnema's stated intent to be domiciled in District 4.

We note that our conclusion here is consistent with those we have reached in comparable prior opinions where the facts were "conflicting and equivocal toward establishing the domicile of the proposed defendant" but found "insufficient to grant leave to sue in quo warranto . . . ." (79 Ops.Cal.Atty.Gen. 21, 27 (1996), quoting 73 Ops.Cal.Atty.Gen., *supra*, at p. 197.) In one instance, for example, where it was alleged

further conclude that it would not serve the public interest to perpetuate, or expend scarce judicial resources on, such an inquiry.[30]  For the reasons discussed above, the application for leave to sue in quo warranto is DENIED.

*****

---

that an official did not reside in his district, his declaration of intent recited supporting facts and included voter registration, mail delivery, and unequivocal affidavits attesting to his presence at his address within the district.  (8 Ops.Cal.Atty.Gen., *supra*, at pp. 221–223.)  The proposed relator offered unverified allegations that the official's car registration and postal address were outside of his district, that his utility usage at his residence outside the district was normal, while such usage at his residence within the district was minimal, and that he sought additional gas from the rationing board to cover his commute from his out-of-district address.  (*Id.* at p. 223.)  We denied leave to sue because the proposed relator's evidence, weighed against the official's direct evidence, was not persuasive.  (*Ibid.*; see also, e.g., 75 Ops.Cal.Atty.Gen., *supra*, at p. 289; 72 Ops.Cal.Atty.Gen., *supra*, at pp. 70–71 [weighing "very strong direct evidence" of "intent versus only some circumstantial evidence to the contrary" to conclude such circumstantial evidence fell short of justifying quo warranto action to challenge domicile]; 72 Ops.Cal.Atty.Gen., *supra*, at pp. 22–23.)

[30] 99 Ops.Cal.Atty.Gen., *supra*, at p. 81.

10

17-601